782 A.2d 473 (2001)
344 N.J.Super 443
ILLVA SARONNO CORP., a New Jersey Corporation, Plaintiff-Appellant,
v.
LIBERTY HILL REALTY INC., a New Jersey Corporation; and Renay Salamon, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 2001.
Decided October 24, 2001.
*474 Edward A. Berman, Morristown, argued the cause for appellant (Hersh, Ramsey & Berman, attorneys; Charlotte A. Beeton, on the brief).
Dana Coleman-Caparoso argued the cause for respondents (Alan L. Zegas and Associates, attorneys; Alan L. Zegas and Patricia A. Lee, on the brief).
Before Judges BAIME, FALL and AXELRAD.
The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
Plaintiff, Illva Saronno Corp. ("Saronno"), appeals from the entry of an order entered on December 23,1999, upholding a listing agreement between the parties and dismissing plaintiff's complaint against defendants, Liberty Hill Realty, Inc. ("Liberty Hill") and its principal owner and operator, Mrs. Renay Salamon ("Salamon").
The litigation arises out of a dispute involving two agreements executed between the parties. Plaintiff is the successor-in-interest to Memi Reina Financial Services Realty Corporation ("MRFSR"). Liberty Hill is a corporation principally engaged in the real estate brokerage business. Salamon is a licensed real estate broker.
Salamon acted as a broker on behalf of herself and her four neighbors for the sale to MRFSR of an assemblage of 508 contiguous acres of undeveloped rural farmland in Hunterdon County, which included the 143-acre Salamon family farmland. On September 10, 1986, MRFSR's vice president and Salamon, acting as president of Liberty, executed a letter memorandum confirming the parties' agreement that MRFSR would purchase the entire assemblage, less Salamon's retained 25% interest in her family's tract. MRFSR further agreed that it would purchase Salamon's retained interest at a later date on specified terms after the receipt of certain development approvals. Part of the agreement *475 was that MRFSR granted to Liberty the exclusive listing for the sale of the assembled tract and any listed contiguous lands which it may acquire, or any parts thereof
for a term commencing upon the execution of this agreement and continuing for a period to end ... ten years after the first final approval of any part of the Project or two years beyond the end of any governmentally imposed construction schedule, whichever is longer ... at a price of $25,000 per acre or at a greater or lower price if we so agree.
The agreement further stated:
We will immediately execute a formal listing agreement with Liberty Hill Realty, Inc. You have agreed that if our development is sold as undeveloped land, you [Liberty/Salamon] will receive a commission equivalent to 6% if you are the selling broker (10% total commission shall be paid if you are not the selling broker) and 4½% commission shall be paid on each unit sold after the issuance of a building permit for said unit in the event that the property is sold after construction has occurred and lands are fully developed.
The parties also agreed that "exclusive control of development of the Project shall lie with ... [MRFSR which] agrees to use its best reasonable efforts to expeditiously and economically develop the Project."
Furthermore, according to paragraph eight of the agreement:
In the event that ... [MRFSR] determines to sell the Project or any portion which may include your property before any approvals have been obtained, we will pay you 100% of the fair market value of your interest in the property, which shall be determined by the method set forth in Paragraphs 1 and 2, or at a minimum price of $21,000.00 per acre, whichever is higher. We agree that we will not sell any of the Project for less than its fair market value.
Contracts for the purchase of the five properties were completed and proceeded to closing with a commission on each sale paid to Liberty Hill. On December 23, 1986, the parties executed an "Exclusive Listing Agreement," "supplement[ing] and amend[ing] the Letter Memorandum of the parties dated September 5, 1986," under which MRFSR, its successors and assigns, agreed to pay Liberty Hill "a commission as hereinafter set forth, if the property, or portion thereof, to be sold, as the case may be, is undeveloped, based upon a sales price of $25,000.00 per acre unless the parties hereto shall in writing agree to a greater or lower price." The agreement further provided, as follows:
If the property covered by this Agreement, or any part thereof, is sold as undeveloped land, Liberty Hill Realty, Inc .... shall be paid a commission equivalent to 6% of full sales price if Liberty Hill Realty, Inc .... is the sole selling broker. In the event that another licensed real estate agency ... entitled to receive a commission, is involved in any sale of undeveloped land, ... [MRFSR] shall pay a 10% total commission, same to be based on the total sales price.
[MRFSR] ... agrees to pay a commission of 4.5% of the total sales price on each dwelling or business unit, building lot or parcel of land sold after the issuance of a building permit for same... to Liberty Hill Realty, Inc .... if it is the sole broker involved in the sale of same....
The duration of the agreement was set forth as follows:
This exclusive listing authorization shall remain in effect for a term which commenced September 5, 1986 and continuing *476 for a period to end ten (10) years after the first final approval of the Planning Board of the Township of Readington... of any substantial part of the development of the property listed in "Exhibit A" or any lands contiguous thereto which may hereafter be acquired by ... [MRFSR] ... or two years beyond the end of any governmentally imposed construction schedule, whichever is longer.
Thereafter, plaintiff devised several conceptual plans for the use of the 508-acre tract including the development of 2,000 to 3,000 townhouses, a life care facility, and 750 senior/adult units. Plaintiff made a series of presentations of these conceptual plans to the Readington Township Planning Board ("Board") but made no formal application to the Board concerning these plans.
On or about August 26, 1997, plaintiff filed a complaint seeking a declaratory judgment to determine the rights and obligations of the parties under the agreements. Plaintiff sought to rescind the exclusive listing agreements or reform the contracts and establish a price for Salamon's interest which she retained in the assemblage. In the alternative, plaintiff sought to invalidate the exclusive listing agreement on the basis that it violated specific provisions of the Real Estate Brokers and Salesmen statutes, N.J.S.A. 45:15-17(b) and (f).
After a seven-day bench trial, Judge Pursel issued a written decision, ruling that the September 5, 1986 letter agreement and the December 23, 1986 exclusive listing agreement are "dependent upon the other" and must be "read together." Judge Pursel also ruled that plaintiff is not entitled to rescind or reform the agreements, the exclusive listing agreement is valid and enforceable between the parties, and there was no joint venture or partnership arrangement between the parties.
On appeal, plaintiff asserts that the trial judge had an insufficient basis in the record for his decision and that the listing agreement is void under N.J.S.A. 45:15-7(b) and (f) because Salamon, the licensed broker for Liberty Hill, acted for more than one seller without the knowledge of all the sellers, and because the agreement fails to specify a terminal date. We disagree and affirm.
In his eleven-page written opinion attached to the December 23, 1999 order, Judge Pursel sufficiently detailed his findings of fact, which included his assessment of the credibility of the witnesses, and his conclusions of law. The judge heard the testimony of Joseph Alessandra, MRFSR's Vice-President; Thomas DeBianca, attorney for the Kanach family, one of Salamon's neighbors who was involved in the assemblage sale; Dave Kelso, plaintiff's Executive Vice-President and General Manager on behalf of plaintiffs; Angelo Reina, Plaintiff's President; and Salamon on behalf of defendants. He found that the September agreement was the subject of intense negotiation with all parties represented by counsel, and was unanimously approved by plaintiff's Board of Directors and gone along with by Reina. He further found that Salamon provided substantial assistance in assembling and completing the purchase agreements for the properties acquired by MRFSR, and found it immaterial to her agreement with plaintiff that defendant received a brokerage commission on each of the sales from her neighbors to plaintiff.
Based upon DeBianca's testimony that Salamon had made his clients aware that she was retaining an interest in her family farmland as part of the sale and that she or her agency would receive commissions on the eventual sale and development of *477 the assembled tract, the judge found that there was no violation of the disclosure requirements of N.J.S.A. 45:15-17(b). This section permits the Real Estate Commission to revoke the license of a broker "[a]cting for more than one party in a transaction without the knowledge of all parties thereto...."
The judge also made extensive findings with respect to plaintiff's claim of a violation of N.J.S.A. 45:15-17(f) as a basis to invalidate the exclusive listing agreement. This section permits the Real Estate Commission to revoke the license of a broker who "[f]ail[s] ... to specify [within any sale or exclusive sales or rental listing contract] ... a definite terminal date which terminal date shall not be subject to any qualifying terms or conditions." According to the trial judge,
the parties [who were both represented by counsel in negotiating the agreements] were both sophisticated in the development, improvement, subdivision and sale of real estate. The parties were clearly aware of the complexities of intergovernmental relations and the expense and difficulty of dealing with municipal and state authorities.
It was clearly the contemplation of the parties that development plans would expeditiously be followed and that in the course of their experience the time frame set forth in the agreements are clearly definable, clearly understood by the parties and are governed only by the obligation of "good faith and fair dealing" of both parties to the agreement.
The judge found that plaintiff retained exclusive control over development of the tract and did not file a formal application with the Board for more than twelve years following execution of the agreements. The judge also found that Salamon always acted in good faith and performed all of her obligations under the agreements. He concluded that plaintiff did not "pursue the development in a businesslike and diligent manner."
The trial judge found that the "statute did not require a definitive calendar date in all listing agreements ..." but rather a determination as to whether the termination date was definable to both parties given their surrounding circumstances. Concluding that it was, he upheld the exclusive listing agreement.
"Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). The trial judge heard extensive testimony and made express credibility assessments and factual findings. We see no basis to disturb those. With respect to plaintiff's claim regarding N.J.S.A. 45:15-17(b), we note that plaintiff's counsel, Nicholas McClear, stated at trial that regarding "the failure to disclose commissions ... we consent to a dismissal of that count of our complaint." Judge Pursel, in his ruling on the oral motion to dismiss plaintiff's complaint, found that "[p]laintiff has removed the failure of disclosure from the issue because of the testimony of ... the attorney, DiBianca" even though he addressed the substantive claim in his written opinion.
In oral argument before us, counsel for plaintiff acknowledged that he was not necessarily attacking the trial judge's factual findings in this appeal, but asserted that the judge erred as a matter of law in upholding the exclusive listing agreement after finding that "the terms of the agreement technically violated" N.J.S.A. 45:15-17(f).
We may review the trial court's legal interpretation without limitation. "A trial court's interpretation of the law and *478 consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
We are not convinced that the authority cited by plaintiff prevents the recovery of real estate commissions by Liberty and Salamon. Plaintiff relies upon Maraziti v. Corigliano, 29 N.J.Super. 86, 101 A.2d 559 (App.Div.1953) (holding that an exclusive sales listing agreement in effect for five weeks from the date of the agreement and thereafter until defendant gave the broker ten days written notice of termination violated N.J.S.A. 45:15-17(f), but was not void under the statute's "savings clause"[1]); the statutory amendment striking the savings clause in express response to Maraziti, supra, L. 1954, c. 193, § 2; Winding Brook Realty v. Platzer, 166 N.J.Super. 575, 400 A.2d 145 (Law Div.1979), aff'd, 173 N.J.Super. 472, 414 A.2d 596 (App.Div. 1980); and Coldwell Banker Commercial Real Estate Serv's v. Wilson, 700 F.Supp. 1340 (D.N.J.1988) (holding that for public policy reasons a broker is precluded from collecting commissions under an agreement that violates N.J.S.A. 45:15-17).
The parties used the following language in defining the duration of their exclusive listing agreement: "a period to end ten (10) years after the first final approval of the ... [Board] of any substantial part of the development of the property ... or two years beyond the end of any governmentally imposed construction schedule, whichever is longer." Although the trial judge used the term "technical violation" while discussing this provision, it is apparent from his explanation that he meant that although the termination date is easily definable by the parties, the agreement does not specify a precise calendar date. We do not perceive the language of the subject agreement to constitute a violation of N.J.S.A. 45:15-17(f), and affirm the conclusion of Judge Pursel that the duration of this contract is sufficiently definite under the statute to justify its enforceability between the parties.
We do not construe this statute as mandating the court to invalidate a commission agreement in all instances other than those in which the parties establish a specific calendar date of termination. We find that the statute must be read in the context of the particular business considerations involved and the realities of multi tiered listing agreements.
Here, the parties drafted agreements to account for an intended flexibility in their future business considerations; the broker retained an interest in the property, and the rate of commissions to be paid was conditioned on whether the property would be sold as undeveloped or developed land, or after the issuance of building permits.
In negotiating the terms of a broker's contract, sophisticated business people, represented by counsel, anticipate that there will be important future marketing decisions to be made as to when the property should be sold. Also, these parties realize at the time they negotiate a contract that it is quite possible they will encounter future delays, complexities, and uncertainties in obtaining municipal and/or governmental development and construction approvals. Therefore, it would be fruitless and impractical for parties like those in the instant case to enter into an agreement with an absolute termination date, e.g., for a term of ten years from the execution of the agreement.
*479 Although the termination date of the agreement in the instant case is predicated upon either the Board's final approval of plaintiff's development application or upon the end of any governmentally imposed construction schedule, whichever is longer, these are not such vague "qualifying terms or conditions" as contemplated by the statute that would preclude the agreement from having a "terminal date" and require its invalidation under N.J.S.A. 45:15-17(f). It is apparent that, as the trial judge concluded, "[i]t was clearly the contemplation of the parties that development plans would be expeditiously followed and that in the course of their experience the time frame set forth in the agreements... [is] clearly definable, clearly understood by the parties and ... governed only by the obligation of `good faith and fair dealing' of both parties to the agreement."
This is not a situation where plaintiff initiated the procedure for developing the parcel as contemplated by the parties under the agreement and due to extenuating circumstances not contemplated by either of the parties, the starting point for the ten-year duration of the agreement could not be determined. In those circumstances, reformation or invalidation of the agreement might be necessary.
It is undisputed that plaintiff, who alone had "exclusive control" over the project and an obligation under the agreement to pursue its development in a diligent manner, never sought any variances for the property. Moreover, it was not until more than a year after filing this law suit, and twelve years after execution of the agreements, that plaintiff submitted its initial application for subdivision and site plan approval to the Board even though, as the trial judge found, based on the competent, credible evidence in the record, that:
[T]he property as zoned offered a reasonable business opportunity and could economically be accomplished.
....
The plaintiff failed to act at a time when the local zoning ordinance would have permitted substantial development of this property without variances. In fact, the plaintiff never sought any variances for this property.
Our construction advances the policy and intent of the statute. We require the duration of an exclusive listing agreement to be sufficiently definable to the parties so that they know when and how it will end. This enables the seller, at that time, to modify the terms of the agreement or engage the services of another broker. This also protects the broker against having its commission jeopardized at the whim of the seller as in Maraziti, supra (ten days after written notice of termination by the seller). Our construction of this statute does not preclude a court from invalidating a sales agreement in order to protect an unsophisticated seller from a far reaching broker who prepares an open ended agreement.
Affirmed.
NOTES
[1] This clause read, "[t]his act shall not be construed to relieve any person from civil liability or criminal prosecution under the laws of this State."