871 A.2d 681 (2005)
377 N.J. Super. 28
Sanford L. KLEIN, D.D.S., M.D., Plaintiff-Appellant,
v.
UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, Robert Wood Johnson Medical School, and Lawrence Kushins, M.D., individually and in his official capacity, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 2, 2005.
Decided April 20, 2005.
*683 Gerald Jay Resnick, Springfield, argued the cause for appellant (Deutsch Resnick, attorneys; Mr. Resnick and Jeanette Tejada, Dumont, on the brief).
Steven F. Ritardi, Roseland, argued the cause for respondents (Lum, Danzis, Drasco & Positan, attorneys; Wayne J. Positan and Mr. Ritardi, of counsel; Mr. Ritardi and Richard A. West, on the brief).
Before Judges NEWMAN, AXELRAD and HOLSTON, JR.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
This appeal raises issues of first impression concerning the applicability of the Conscientious Employee Protection Act CEPA), N.J.S.A. 34:19-1 to -8, to a health care professional who asserts patient safety concerns within his medical department and the consequent actions taken against him by that department.
Plaintiff, Dr. Stanford L. Klein, appeals from summary judgment in favor of his employer, University of Medicine and Dentistry of New Jersey (UMDNJ) and Robert Wood Johnson Medical School (RWJMS), and department head, Dr. Lawrence Kushins, dismissing his CEPA claim. The trial judge denied summary judgment on plaintiff's breach of contract *684 and procedural due process claims, which were thereafter voluntarily dismissed. The crux of plaintiff's argument is that defendants retaliated against him by revoking his clinical responsibilities for several days and requiring observation of his clinical responsibilities when restored after he refused to be assigned to the Radiology Department based upon his "reasonable belief that such anesthesia assignments were a threat to patients' safety" in violation of N.J.S.A. 34:19-3c. We affirm the grant of summary judgment.
We review the evidentiary material presented on defendants' summary judgment motion, as we must, in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146, 147 (1995); R. 4:46. Dr. Klein, who has been practicing medicine for over thirty-two years, is a board-certified anesthesiologist, as well as a dentist. Defendant RWJMS is a medical school within defendant UMDNJ. From 1983 through June 1999, plaintiff served as a tenured professor at RWJMS, Chair of the Department of Anesthesiology at RWJMS, and Chief of Anesthesia Services at Robert Wood Johnson University Hospital (RWJUH) in New Brunswick. Plaintiff was then removed as Chair of the Anesthesia Department and Chief of Anesthesia Services.[1] Dr. Kushins replaced plaintiff as department chair and Chief of Anesthesiology and became his supervisor after plaintiff returned from a disability and a sabbatical in 2001.
For years while plaintiff was department chair, he complained about "patient safety" concerns involving resuscitation and anesthesia due to the cramped working space in the Radiology Department and lack of essential equipment and staffing. Plaintiff reiterated his concerns to Dr. Clifton Lacy, Chief of Staff at RWJUH, by letter of April 19, 2001. Dr. Lacy advised of the steps taken by hospital personnel in response to plaintiff's concerns and directed him to convey any future observations and comments directly to Dr. Kushins in accordance with the hospital's standard procedure. On June 20, 2001, plaintiff responded to Dr. Lacy, requesting time lines and anticipated dates of completion of some of the changes referenced in Dr. Lacy's letter and specifically commented that some of the special procedure rooms in the Radiology Suite were inadequate in size and "[u]nless they [were] enlarged (a capital budget project) no amount of reduction of clutter and equipment [would] make them safe."
On August 10, 2001, plaintiff sent a memorandum to Dr. Kushins entitled "Radiology Conditions Warrant Serious Changes," stating he had "tried for some time to relay the complaints which [he] and every other member of the department who [he had] spoken to have about working in radiology to Dr. Lacy." The memo expressed plaintiff's feelings that, based on Dr. Lacy's response, the safety issues were not being taken seriously and suggested they "inform the hospital that we will not be able to render care in radiology at the end of the current scheduled cases until we get the appropriate changes in the physical plant and personnel we need."
On August 21, 2001, Dr. Kushins replied that the issue would be discussed at the regularly scheduled departmental faculty meeting on September 11, and he would "meet with the hospital administration to *685 make any necessary changes to enhance patient and occupational safety." Dr. Kushins further requested that if plaintiff knew of any hospital that had an ideal physical plant and personnel set-up for the administration of anesthesia in the radiology suite, he should provide the details to hasten resolution of the issue.
In September 2001, members of the Anesthesiology Department created an ad hoc committee, consisting of plaintiff and two other doctors, to review department procedures and propose changes in the manner of anesthesia care in the Radiology Department. The committee forwarded a report of September 25, 2001 to Dr. Lacy which requested a meeting with him and representatives of the Radiology Department on "an urgent basis" to discuss the following patient safety issues requiring "immediate attention," which, as paraphrased, were: (1) designating separate rooms for fluoroscopy and x-ray with permanent carts and stock; (2) having the Radiology Department coordinate all subspecialities so cases could be done with minimal delays or gaps; (3) requiring nurses to stay with patients at bedside while anesthesia is induced rather than being interrupted for equipment set-up; (4) requiring a radiologist to remain in the room for anesthesia induction to minimize delays between induction and the procedure; (5) making a CCT [cardiac-care technician] available for providing equipment and supplies during a case for duties such as running stat blood tests to the lab; (6) permitting biomedical personnel to respond immediately to calls from the anesthesia team regarding malfunctioning monitors and relocation of anesthesia equipment among the different rooms; and (7) making a recovery room satellite available in the Radiology Department to avoid transport of patients recovering from general anesthesia through the basement kitchen area to the first floor.
According to plaintiff, he told Dr. Kushins that until the changes were instituted, he would refuse to work in the Radiology Department out of concern for the care of his patients. After plaintiff completed his assignments on Friday, October 5, 2001, he was instructed by Dr. Kushins to go to the Radiology Department and relieve one of the doctors. Plaintiff refused the assignment and was directed to go home. On Monday morning, October 8, Dr. Kushins advised plaintiff, and memorialized in a memorandum, that effective immediately plaintiff was no longer assigned clinical duties and was directed to review anesthesia records.
On October 12, Dr. Kushins modified this course of action and reinstated plaintiff's clinical privileges but required they be performed under the supervision of another faculty member. More particularly, Dr. Kushins' memorandum stated:
Commencing October 18, 2001, you will be assigned to administer anesthesia in the operating rooms of Robert Wood Johnson University Hospital under the direct observation of another member of the faculty. I have decided to begin this observation for an indeterminate period of time as a result of events reported by department faculty members and surgeons with regard to your clinical performance and interactions which you have had with patients, faculty and ancillary staff during the first seven months of your reorientation to clinical practice.
On November 6, plaintiff's counsel sent a letter to UMDNJ's counsel demanding that plaintiff's clinical duties be reinstated in full without any direct supervision, and that a written statement be issued that Dr. Kushins and the Anesthesiology Department were confident in plaintiff's clinical skills and abilities and apologizing for the actions taken that had "damaged" plaintiff's *686 reputation. Plaintiff voluntarily withdrew himself from all clinical duties in the interim, contending he had no choice because he "wanted to protect [his] professional reputation, and ... succumbing to observation would denote [his] `acceptance' of [those] ludicrous charges" and also because he was concerned about the liability of the hospital and himself.
Plaintiff acknowledged he "refused to accept clinical assignments any longer since the hospital failed to agree to place in writing that [he] had full hospital privileges." On January 9, 2002, plaintiff filed this action, asserting in his complaint that "the actions taken by Dr. Kushins were in retaliation for [plaintiff's] refusal to be assigned to the Radiology Department based upon plaintiff's reasonable belief that such anesthesia assignments were a threat to patients' safety."[2]
In granting summary judgment to defendants, the court found CEPA was not implicated; rather, this was a private dispute between plaintiff and Dr. Kushins as to whether the Radiology Department should have been expanded or improved for efficiency. The court further noted there was no whistle-blowing activity in that plaintiff's concerns were only reported to the department head and not to any regulatory agency which would have the authority to shut down the department because of a hazard. Nor was there an objective showing of a reasonable belief by plaintiff, a health care professional, of any violation of a rule, regulation, law or public policy. The court also found there was no adverse employment action because there was no reduction in plaintiff's salary or rank; plaintiff was only placed on restricted duty by supervision which may have impacted his pride but was insufficient retaliation under the CEPA statute. Moreover, plaintiff voluntarily declined to accept the restored clinical duties.
Plaintiff raises the following issue on appeal:
POINT I
THE TRIAL COURT ERRED WHEN IT DISMISSED PLAINTIFF'S CEPA CLAIM SINCE THE ACT PROTECTS EMPLOYEES WHO OBJECT TO OR REFUSE TO PARTICIPATE IN ANY ACTIVITY THAT CONSTITUTES IMPROPER QUALITY OF PATIENT CARE OR IS INCOMPATIBLE WITH A CLEAR MANDATE OF PUBLIC POLICY CONCERNING PUBLIC HEALTH.
A. Dr. Klein Makes a Prima Facie Case Under CEPA.
B. UMDNJ, RWJMS, and Dr. Kushins Defendant Are Liable Under CEPA For Improper Patient Health Care.
C. UMDNJ, RWJMS, and Dr. Kushins Are Liable Under CEPA For Violating New Jersey Public Policy For Patient Health Care.
D. Dr. Klein Suffered an Adverse Employment Action.
We are not persuaded by these arguments and affirm.

I
N.J.S.A. 34:19-3 defines the class of employee actions protected by CEPA, stating in relevant part:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:

*687 a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; [or]
....
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care; [or]
....
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
[Emphasis added.]
"Improper quality of patient care" is defined as "any practice, procedure, action or failure to act of an employer that is a health care provider which violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." N.J.S.A. 34:19-2f.
A prima facie case of discriminatory retaliation under CEPA requires a plaintiff to demonstrate, in relevant part: (1) a reasonable belief that the employer's conduct was violating either a law, rule, regulation or public policy; (2) he or she performed a "whistle blowing" activity as described in N.J.S.A. 34:19-3a or c; (3) an adverse employment action was taken against him or her; and (4) a causal connection existed between his whistle-blowing activity and the adverse employment action. Bowles v. City of Camden, 993 F.Supp. 255, 262 (D.N.J.1998); Dzwonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893, 900 (2003); Kolb v. Burns, 320 N.J.Super. 467, 476, 727 A.2d 525, 530 (App.Div.1999). If a plaintiff is able to establish these elements, then the defendants must come forward and advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee. Zappasodi v. State, Dept. of Corrections, 335 N.J.Super. 83, 89, 761 A.2d 96, 99-100 (App.Div.2000); Kolb, supra, 320 N.J.Super. at 479, 727 A.2d at 531. If such reasons are proffered, plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual. Bowles, supra, 993 F.Supp. at 262; Kolb, supra, 320 N.J.Super. at 479, 727 A.2d at 531.
Pursuant to the 1997 amendment to the CEPA statute, a licensed or certified health care professional can demonstrate, as the first prong, a reasonable belief that the employer's activity, policy or practice constitutes "improper quality of patient care," that is, "violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." N.J.S.A. 34:19-3c(1), -2f; L. 1997, c. 98, § 2. According to the Senate and Assembly Health Committee statements to the bill adopted as the amendment, "[i]n a growing number of cases, health care professionals are being pressured to accept seriously inadequate staffing levels and delegate their responsibilities to unqualified, non-professional staff. It is of the utmost importance that health care professionals are able to speak out against, and refuse to participate in, these and other practices by their employers which endanger the well-being of patients." Assembly Health Committee, Statement to Senate Bill No. 878, (February 10, 1997); Senate Health Committee, *688 Statement to Senate Bill No. 878, (Nov. 7, 1996).
A plaintiff need not show that his or her employer actually violated a law, rule, regulation, or clear mandate of public policy, just that he or she reasonably believes that to be the case. Dzwonar, supra, 177 N.J. at 462-64, 828 A.2d at 900-01; Estate of Roach v. TRW, Inc., 164 N.J. 598, 613, 754 A.2d 544, 552 (2000); Gerard v. Camden County Health Servs. Ctr., 348 N.J.Super. 516, 522, 792 A.2d 494, 498 (App.Div.), certif. denied, 174 N.J. 40, 803 A.2d 636 (2002). Similarly, a licensed or certified health care professional need only demonstrate a reasonable belief that the objectionable activity, policy or practice of his or her employer constitutes improper quality of patient care as statutorily defined. The "determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187, 707 A.2d 1000, 1012 (1998).
In order for a plaintiff to meet the threshold to withstand summary judgment under N.J.S.A. 34:19-3c, he or she must "furnish the trial court with enough by way of proof and legal basis to enable the court to determine as a matter of law" that the plaintiff has identified "the asserted violation with adequate particularity" for a jury's consideration. McLelland v. Moore, 343 N.J.Super. 589, 601, 779 A.2d 463, 471 (App.Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002). To determine whether a plaintiff has presented a viable CEPA claim under section 3c, a trial court must first identify and enunciate the specific terms of a statute, rule, regulation, declaratory ruling, professional code of ethics, or clear expression of public policy that the employee reasonably believes would be violated if the facts as alleged are true and determine that there is a substantial nexus between the complained-of conduct and the law or public policy identified by the court or the plaintiff. Dzwonar, supra, 177 N.J. at 464, 828 A.2d at 901. Judgment for a defendant is appropriate when no such law or policy is forthcoming. Ibid. "CEPA requires judicial resolution of threshold legal issues respecting existence of a statutory, regulatory or other clear mandate of public policy before the trier of fact determines whether an employee has been retaliated against for acting upon an objectively reasonable belief of the existence of such clear mandate by objecting to or refusing to perform acts in violation of the mandate." Fineman v. New Jersey Dept. of Human Services, 272 N.J.Super. 606, 609, 640 A.2d 1161, 1162 (App.Div.), certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994); see also, McLelland v. Moore, supra, 343 N.J.Super. at 601, 779 A.2d at 471.

II
We determine whether a trial court's ruling on summary judgment is correct based on our interpretation of the law. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597, 600 (App.Div.1998). In determining if the ruling was correct, we "may review the trial court's legal interpretation without limitation." Illva Saronno Corp. v. Liberty Hill Realty, Inc., 344 N.J.Super. 443, 450, 782 A.2d 473, 477 (App.Div.2001).

A.
We agree with plaintiff that he need not prove he complained to an outside regulatory agency to assert a CEPA claim under N.J.S.A. 34:19-3c. To the extent the trial court considered this as a necessary element of section "c" it was mistaken. Contrary to plaintiff's assertion, however, the court did not require the *689 employee to prove an actual violation of patient health care, just to explain with adequate particularity the underlying law or public policy upon which plaintiff based his claim.
The allegations in plaintiff's complaint as to "patient safety issues in the Radiology Department requiring immediate attention" were those contained in the September 2001 ad hoc committee report: designating separate rooms for fluoroscopy and x-ray, requiring nurses to stay with patients while anesthesia is induced rather than being interrupted for equipment set-up duties, the availability of a CCT for such functions as providing equipment and supplies, and permitting biomedical personnel to respond immediately to calls from the anesthesia team regarding malfunctioning monitors and relocation of anesthesia equipment among different rooms.
When plaintiff's counsel was asked by the motion judge at oral argument what he reasonably believed defendants to be in violation of, he responded "providing improper health care... [o]n the basis that ... the Radiology Department had ... a number of ... dangerous issues there and ... it was an environment in which there could be a danger to the health of ... the patients in the hospital." Plaintiff's counsel also referenced his brief which asserted violation of N.J.A.C. 8:43G-6.3 (Hospital Licensing Standards, Anesthesia staff qualifications for administering anesthesia), N.J.A.C. 8:43G-6.6 (Hospital Licensing Standards, Anesthesia supplies and equipment; safety systems) and N.J.A.C. 8:43G-6.8 (Hospital Licensing Standards, Anesthesia supplies and equipment; patient monitoring). Plaintiff's reply brief states he "had voiced for years his concerns about the ever increasing case load for Anesthesia in Radiology. His fellow Anesthesiologists complained aggressively of equipment breakdown, lack of back up, and little or no technical support."
Plaintiff correctly states that adequate health care is a long established public policy in the State of New Jersey. It is undisputed there is a strong public policy in New Jersey to ensure that health care services provided in this state are of the highest quality. In re Certificate of Need Granted to the Harborage, 300 N.J.Super. 363, 382, 693 A.2d 133, 142-43 (App.Div.1997). However, merely couching complaints in terms of a broad-brush allegation of a threat to patients' safety is insufficient to establish the first prong of a CEPA claim. The Legislature expressly defined "[i]mproper quality of patient care" as "any practice, procedure, action or failure to act of an employer" which "violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." N.J.S.A. 34:19-2f. The general whistle-blowing provision of N.J.S.A. 34:19-3c(3) pertaining to any employee requiring a policy or practice by the employer "incompatible with a clear mandate of public policy concerning the health, safety or welfare or protection of the environment" imposes no lesser standards for CEPA protection.
Notwithstanding its flexible application, CEPA is not as liberal as asserted by plaintiff. The whistle-blower legislation is not intended to shield a constant complainer who simply disagrees with the manner in which the hospital is operating one of its medical departments, provided the operation is in accordance with lawful and ethical mandates. See Young v. Schering Corp., 275 N.J.Super. 221, 237, 645 A.2d 1238, 1246 (App.Div.1994) (CEPA "was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful."), aff'd, 141 N.J. 16, 660 A.2d 1153 (1995).
*690 As mandated by Dzwonar, we must conduct an inquiry into a statute, regulation or clear mandate of public policy which has allegedly been violated to determine if the conduct is sufficiently linked to the statute, regulation or clear mandate of public policy. Dzwonar, supra, 177 N.J. at 463, 828 A.2d at 900-01. In Dzwonar, the plaintiff, an arbitration officer for Local 54 who was discharged for mishandling executive board meeting minutes and for insubordination, asserted retaliation for expressing her opinion that by failing to read its minutes at general membership meetings, the board denied its rank-and-file members the right to participate, deliberate and vote in union matters as prescribed by the Labor Management Reporting and Disclosure Act (LMRDA). Id. at 456-58, 828 A.2d at 896-97. In evaluating Dzwonar's claim, the Court analyzed the specific rights afforded and conduct proscribed by the cited provisions of the LMRDA and found no relationship between her claims and the statute. Id. at 468, 828 A.2d at 903-04. The Court concluded that Dzwonar's dispute merely concerned a disagreement regarding access to information and the adequacy of the union's internal procedures and thus she did not possess an objectively reasonable belief the LMRDA was being violated. Id. at 467-68, 828 A.2d at 903-04. As she was unable to establish the existence of a clear mandate of public policy or law violated by defendant's conduct, she was unable to establish the first prong of a CEPA claim. Id. at 469, 828 A.2d at 904.
N.J.A.C. 8:43G-6.3 sets forth the criteria for hospital-wide anesthesia credentialing and limits those who can administer or monitor anesthesia. Plaintiff has not asserted that unqualified persons were administering anesthesia in the Radiology Department or that a qualified person was not continuously present and performing or assisting in the operation. Nor has plaintiff asserted that the Radiology Department did not employ the requisite anesthesia supplies, equipment or safety systems mandated by N.J.A.C. 8:43G-6.6, or perform the appropriate patient monitoring mandated by N.J.A.C. 8:43G-6.8. Plaintiff's complaints, which served as the basis for his refusal to perform the radiology assignment on October 5, 2001, were essentially those dating back to his tenure as chair of the department: additional staffing, more space, and special procedure rooms permanently stocked with equipment and supplies rather than generic rooms with portable machinery and supplies.
Although these recommendations would potentially improve the safety and efficiency of the Radiology Department, they are essentially disagreements with the internal procedures and priorities of the hospital, potentially tied to some extent to funding issues, resource allocations and state budgetary constraints, and are not an objectively reasonable belief that public health mandates are being violated. We must not lose sight of the fact that plaintiff's employer is the State medical university and hospital which is governed by a Board of Trustees, and is subject to economic and medical regulations and periodic inspections, review and certifications pertaining to, among other areas, quality patient care, staffing, and national accreditation. The record is devoid of any evidence, nor does plaintiff even allege, any state or federal regulatory violations committed by the Radiology Department for the concerns he expressed in this litigation.
In finding no rule, regulation, law or public policy violation pertaining to public health and public safety, the motion judge appropriately categorized plaintiff's whistle-blowing activity as "a private dispute between Dr. Klein and Dr. Kushins" pertaining to issues such as the physical layout *691 constraints of the Radiology Department, the difficulty of operating the equipment in the confined space, and the balancing of adequate staffing and equipment with budgetary constraints. Moreover, plaintiff's claim of an improper quality of patient care or a violation of law or public policy in the Radiology Department is undermined by his declared intention to resume his duties upon restoration of full clinical privileges and receipt of a written acknowledgement by defendants of their confidence in his clinical skills and an apology for their actions.
CEPA was enacted to prevent retaliatory action by an employer against an employee who "blows the whistle on illegal or unethical activity committed by their employers or co-employers," Roach, supra, 164 N.J. at 609-10, 754 A.2d at 550, not to assuage egos or settle internal disputes at the workplace as in the present case. Applying all favorable inferences to plaintiff's allegations for which he asserts his employer retaliated, we are satisfied plaintiff has not sufficiently identified any illegal, unethical, or public policy violation sufficient to satisfy the first prong of a prima facie case of a CEPA claim under the language or intent of N.J.S.A. 34:19-3c.

B.
Plaintiff further contends he presented a prima facie case under CEPA because he refused a radiology-anesthesia assignment out of concern for his patients' safety, his conduct falls directly within the provisions of N.J.S.A. 34:19-3, and based on his refusal to work in the Radiology Department, his clinical privileges were immediately suspended and were thereafter restored under supervision. Plaintiff argues the conditional restoration of clinical privileges is the functional equivalent of a suspension. We disagree.
On October 8, 2001, Dr. Klein was reassigned from the operating room to reviewing anesthesia records and by that Friday he was reassigned back to the operating room under supervision. Neither of these actions, as a matter of law, satisfies the third prong of a prima facie CEPA case of adverse employment action. Dzwonar, supra, 177 N.J. at 462-63, 828 A.2d at 900. The Legislature has defined a "[r]etaliatory action" under the CEPA statute as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2e. In Hancock v. Borough of Oaklyn, 347 N.J.Super. 350, 360, 790 A.2d 186, 193 (App.Div.2002), we interpreted this provision as requiring an employer's action to have either impacted on the employee's "compensation or rank" or be "virtually equivalent to discharge" in order to give rise to the level of a retaliatory action required for a CEPA claim.
Moreover, "`[r]etaliatory action' does not encompass action taken to effectuate the `discharge, suspension or demotion'" but rather "speaks in terms of completed action." Id. at 360, 790 A.2d at 193 (emphasis added) (quoting Keelan v. Bell Communications Research, 289 N.J.Super. 531, 539, 674 A.2d 603, 607 (App.Div.1996)). See also Borawski v. Henderson, 265 F.Supp.2d 475, 487 (D.N.J.2003) (Under the CEPA a retaliatory action "is confined to `completed... personnel actions that have an effect on either compensation or job rank.'" (quoting Hancock, supra, 347 N.J.Super. at 360, 790 A.2d at 193)).
The imposition of a minor sanction is insufficient to constitute a retaliatory action under the statute. Hancock, supra, 347 N.J.Super. at 360-361, 790 A.2d at 193. Nor does the imposition of a condition on continued performance of duties in and of itself constitute an adverse employment *692 action as a matter of law, absent evidence of adverse consequences flowing from that condition. See, e.g., Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir.) (being required to undergo a psychological evaluation does not, in and of itself, constitute an adverse employment action as a matter of law), cert. denied, 531 U.S. 816, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 755 (4th Cir.), cert. denied, 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) (accord). Although plaintiff feels that performing his clinical duties under the observation of his colleagues, some of whom were younger and had fewer years of experience, was demeaning, this does not meet the statutory definition of a retaliatory act. An employer's actions are not retaliatory under CEPA merely because they result in a bruised ego or injured pride on the part of the employee.
Defendant was temporarily reassigned from clinical to administrative duties and then was assigned to administer anesthesia in the hospital's operating room under the direct observation of another faculty member "for an indeterminate period of time."[3] Plaintiff was not discharged; he did not suffer a reduction in rank, compensation, or title; he was not terminated, suspended or demoted. Nor were defendants' actions a change in the terms and conditions of plaintiff's employment so as to be the functional equivalent of a demotion or suspension. Most significantly, plaintiff voluntarily withdrew from all clinical duties because defendants would not remove the supervision requirement or furnish a written retraction or apology, thus there was not "completed action" by the employer.
As plaintiff could not demonstrate a cognizably reasonable belief of an improper quality of patient care or a violation of regulation or clear mandate of public policy by defendants, nor retaliatory action by defendants sufficient to demonstrate a prima facie case of discriminatory retaliation under CEPA, summary judgment was appropriately granted to defendants dismissing plaintiff's complaint as a matter of law.
Affirmed.
NOTES
[1] In June 2000, plaintiff filed a CEPA action relating to his removal, which was dismissed on summary judgment. We affirmed in an unpublished opinion, Klein v. UMDNJ, A-6350-01T5, and the Supreme Court denied certification, 180 N.J. 355, 851 A.2d 649 (2004).
[2] Apparently, some months after the October 2001 incident, Dr. Kushins wrote a report to the credentials committee recommending that plaintiff's privileges not be renewed. We were advised at oral argument that there were subsequent administrative proceedings which are not relevant to the matter under appeal.
[3] This action can be challenged by plaintiff in an administrative forum; it is our understanding he has done so.