**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2096
_____

SUSAN TINIO,
　　　　　　　　Appellant

v.

SAINT JOSEPH REGIONAL MEDICAL CENTER;
JOHN DOES 1-10;
ABC CORP. 1-10, said names being fictitious
_____

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. No. 2-13-cv-00829)
District Judge: Honorable Jose L. Linares
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 25, 2016
_____

Before: VANASKIE, SHWARTZ, and KRAUSE, *Circuit Judges*

(Filed: March 25, 2016)
_____

OPINION[*]
_____

VANASKIE, *Circuit Judge.*

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Appellant Susan Tinio filed this lawsuit against her former employer, Appellee St. Joseph's Regional Medical Center, alleging that her termination constituted illegal retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1, *et seq.*; and the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1, *et seq.* The District Court granted summary judgment in favor of St. Joseph's on all three claims, concluding that Tinio failed to produce evidence sufficient to sustain a prima facie case of retaliation under any of the statutes. For the reasons that follow, we agree that Tinio failed to present sufficient evidence to support her claims of retaliatory discharge. Accordingly, we will affirm the District Court's judgment.

I.

Because we write primarily for the parties, we provide background only as relevant to the issues on appeal. Tinio was employed as a registered nurse by St. Joseph's Regional Medical Center from 1991 until 2012. In October 2010, Tinio's co-worker, Caroline Timothee, filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination against her former Nurse Manager, Darlene Borromeo. Shortly after receiving the complaint, St. Joseph's conducted an internal investigation in which Employee Relations Manager, Linette Santos, along with outside counsel, interviewed Tinio and the rest of the nursing staff. Tinio asserts that during this interview she expressed her belief that Borromeo did engage in racial discrimination against Timothee.

2

On January 19, 2011, Timothee, Santos, and their respective legal counsel met at the EEOC office in Newark, New Jersey for a mediation session. Tinio drove Timothee to the mediation, but Tinio did not participate in the mediation. As Santos was leaving the EEOC office, she saw Tinio waiting in the lobby. Tinio was not with Timothee when Santos saw Tinio, and Santos stated that at that time she did not know why Tinio was at the EEOC office. When asked if she made "any assumption that [Tinio] was there because of the Timothee proceeding," Santos replied she "didn't think about it either way." (J.A. 286.)

St. Joseph's settled Timothee's employment discrimination charge at the mediation session that day and thereafter ended its employment relationship with Borromeo. On March 11, 2011, St. Joseph's hired David Albus as the new Nurse Manager.

About one year later, Albus met with Tinio to give her his first formal evaluation of her performance. During this meeting, Tinio complained about the lack of a Patient Care Associate ("PCA") on the unit.[1] According to Albus, all of the RNs complained about the lack of PCAs, and Albus considered it a universal issue with the staff.

Central to this dispute are the events of July 10, 2012, of which the parties present dramatically different accounts. St. Joseph's claims that Tinio was insubordinate and engaged in heated arguments with Albus and Dr. Lauren LaPorta, head of the psychiatric unit, regarding the administration of a patient's pain patch. According to St. Joseph's, a

---

[1] A PCA generally handles the custodial and ministerial duties on a unit, relieving the nurses of those responsibilities.

patient approached the nurse station and complained that Tinio had removed her pain patch and refused to replace it. When Albus questioned Tinio about this, she became defensive and insisted that the patch needed to be removed and changed every eight hours. Albus told her that the patch only needed to be checked every eight hours. He instructed Tinio to replace the patch immediately. When Albus returned three to four hours later, however, Tinio had still not replaced the patch.

This same patient also approached Dr. Laporta that day and told Dr. LaPorta that Tinio had not treated her well and had been very short with her. When questioned about this, Tinio engaged in a heated argument with Dr. LaPorta over the proper administration of the pain patch. Dr. LaPorta asked Tinio to reapply the patch, but Tinio did not reapply it. Ultimately, one of Tinio's co-workers applied the pain patch to the patient.

Tinio's version of the events is drastically different. Tinio alleges that the patient removed the patch and that she knew the patch was only to be removed once every three days. While she was waiting for a new patch to be ordered, Albus confronted her and accused her of removing the patch. She explained to Albus that the patient removed the patch and she was waiting for Dr. LaPorta to order a new one, which she promptly applied when it became available. Tinio claims that she never refused to follow orders from Albus and was never involved in an argument with Dr. LaPorta.

Shortly after the July 10th incidents, Albus discussed the situation with Santos, and St. Joseph's officials decided to terminate Tinio's employment.[2] Albus then sent

---

[2] In addition to the incident involving the pain patch, another incident occurred on the morning of July 10, 2012. According to St. Joseph's, Tinio had failed to give a

4

three emails—dated July 16th, 23rd, and 25th—asking to meet with Tinio so they could discuss the incidents of July 10th. Albus also sent a letter to Tinio, dated July 30, stating that he had tried to contact Tinio and if they did not meet by August 6th, he would assume she resigned. Tinio then got in touch with Albus and scheduled a meeting for August 6th. On the morning of August 6th, Tinio cancelled the meeting because she said she was not feeling well and that she was worried about her mother, who lived alone, in light of a recent storm. Thereafter, St. Joseph's sent her a letter terminating her employment.

Tinio filed a complaint in the United States District Court for the District of New Jersey and asserted claims for retaliation in violation of: (1) Title VII, (2) NJLAD, and (3) CEPA. St. Joseph's filed a motion for summary judgment on all three claims, which the District Court granted.

## II.

The District Court had jurisdiction over Tinio's Title VII claim under 28 U.S.C. § 1331 and had supplemental jurisdiction over Tinio's NJLAD and CEPA claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's order granting summary judgment is plenary. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134 (3d Cir. 2013). We view the evidence "in the light most favorable to the nonmoving party." *Id.* at 134–35 (quoting *Kurns v. A.W. Chesterton*

_____

patient needed medication for over two hours. Tinio contends that she did not receive the information needed to give the patient the medication, and when she attempted to do so, the patient resisted because she was being discharged shortly thereafter. Tinio also asserts that Albus falsely accused her of shouting at the patient. However, Albus testified that this incident did not contribute to Tinio's firing.

5

*Inc.*, 620 F.3d 392, 395 (3d Cir. 2010)).  Summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

III.

A.

To make out a prima facie claim for retaliation under both Title VII and NJLAD, a plaintiff must show: "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)); *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 630–31, 660 A.2d 505, 508 (1995).[3]  Protected employee activity includes "participat[ing] in certain Title VII proceedings" and "oppos[ing] discrimination made unlawful by Title VII."  *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006); *see also Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009); *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 548–49, 70 A.3d 602, 620–21 (2013) (explaining that the NJLAD protects similar activity).  A causal connection between the protected activity and the adverse employment action can

---

[3] If a plaintiff demonstrates a prima facie case, we apply the *McDonnell Douglas* burden-shifting analysis.  *Daniels*, 776 F.3d at 193; *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007).  In this case, the District Court concluded that even if Tinio had presented a prima facie case, she failed to show that St. Joseph's legitimate, non-retaliatory reasons for firing her—her insubordination on July 10th—was pretextual.  Because we agree with the District Court that Tinio failed to set forth a prima facie case, we need not engage in this analysis.

be shown where "the temporal proximity between the protected activity and the adverse action is unusually suggestive." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal quotation marks omitted). Where the temporal proximity is not unusually suggestive, "we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196.

Tinio asserts that she engaged in protected activity in October 2010 during St. Joseph's internal investigation of Timothee's discrimination complaint and in January 2011 when Tinio drove Timothee to her mediation at the EEOC office. Tinio further contends that there is a causal connection between her protected activities and her termination as evidenced by the timing between her protected activity and her termination, intervening antagonism, and St. Joseph's alleged inconsistencies in its stated reasons for termination. The District Court rejected Tinio's argument and concluded that, even assuming that Tinio engaged in protected activity, Tinio "cannot establish the necessary causal link required to set forth a *prima facie* case of retaliation because any assistance rendered to Ms. Timothee in support of her EEOC charge is too attenuated from the termination of her employment." (J.A. 17.) Moreover, the District Court concluded that Tinio had not produced "a single piece of evidence in support of this conclusory allegation that there was ongoing antagonism," (J.A. 16, n.4), and that St.

7

Joseph's "consistently stated that [Tinio's] termination was for insubordination," (J.A. 18.)

We concur with the District Court's conclusion. Even assuming that both events qualify as protected activity, Tinio has not presented sufficient evidence to suggest a causal connection between the alleged protected activities and her August 6, 2012 termination. First, the temporal proximity between Tinio's protected activity and her termination is not unusually suggestive. St. Joseph's terminated Tinio approximately twenty-two months after St. Joseph's internal investigation of Timothee's claim and approximately nineteen months after Tinio drove Timothee to her EEOC mediation. *See LeBoon*, 503 F.3d at 233 (holding that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."). Second, Tinio has not put forth any evidence of antagonism or retaliatory animus on the part of St. Joseph's,[4] and St. Joseph's has consistently asserted that it terminated Tinio for her alleged insubordination on July 10, 2012. Finally, the protected activity occurred months before St. Joseph's hired Albus, and Tinio has not produced any evidence that Albus was aware of Tinio's involvement in Timothee's discrimination claim. *See Daniels*, 776 F.3d at 196 ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the

---

[4] Tinio did testify that Borromeo treated her with hostility after she drove Timothee to the EEOC hearing, but this does not support a causal connection because Borromeo left St. Joseph's well before Tinio's termination. Further, Tinio also testified that she "never felt discrimination until Mr. Albus came into the picture" after the alleged protected activity. (J.A. 90.)

8

individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.").

Because Tinio cannot show a causal connection between her protected activity and her termination, we will affirm the District Court's grant of summary judgment on her Title VII and NJLAD retaliation claims.

B.

To make out a prima facie claim for retaliation under CEPA, a plaintiff must show: (1) she reasonably believed her employer acted in a manner incompatible with a law, rule, regulation, or clear mandate of public policy; (2) she engaged in whistleblowing activity as described in N.J. Stat. Ann. § 34:19-3; (3) an adverse employment action was taken against her; and (4) a causal connection between the whistleblowing activity and the adverse employment action. *Hitesman v. Bridgeway, Inc.*, 218 N.J. 8, 29, 93 A.3d 306, 318 (2014); *Sarnowski*, 510 F.3d at 404.[5] In order to satisfy the first element of a CEPA claim, a plaintiff "must identify the authority that provides a standard against which the conduct of the defendant may be measured," and "demonstrate a substantial nexus between the employer's conduct and the identified

---

[5] If a plaintiff demonstrates a prima facie case, we apply the *McDonnell Douglas* burden-shifting analysis. *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 89–90, 50 A.3d 649, 662 (2012). As with Tinio's Title VII and NJLAD claims, the District Court concluded that even if Tinio had presented a prima facie case, she failed to show that St. Joseph's legitimate, non-retaliatory reasons for firing her—her insubordination on July 10th—was pretextual. Because we agree with the District Court that Tinio failed to set forth a prima facie case, we need not engage in this analysis.

9

[authority]." *Hitesman*, 218 N.J. at 31, 33, 93 A.3d at 319–20.[6] In order for a substantial nexus to exist, the mandate of public policy "cannot be vague" and must "provide[] [a] standard by which . . . a deficiency can be ascertained." *Id*. at 321, 323.

Tinio argues that she reasonably believed that St. Joseph's failure to staff a PCA on the unit violated a clear mandate of public policy delineated in the DNV Healthcare Inc. Accreditation Requirements.[7] The provision Tinio claims St. Joseph's violated states: "There shall be adequate numbers of licensed registered nurses, licensed practical nurses, supervisory, and other staff to provide nursing care to all patients as needed. A registered nurse must be immediately available for the bedside care of every patient, as required by State law." (J.A. 515.)

This policy does not bear a substantial nexus to St. Joseph's failure to staff a PCA on the unit. The provision does not mention PCAs, much less require PCAs to be staffed on every nursing unit. Rather, this is a vague provision regarding the staffing of nurses that provides no standard by which a deficiency can be ascertained. *See Hitesman*, 218 N.J. at 33, 93 A.3d at 320 ("CEPA is not intended to protect an employee 'who simply disagrees with the manner in which the hospital is operating one of its medical departments . . . .'" (quoting *Klein v. Univ. of Med. & Dentistry of N.J.*, 377 N.J. Super.

---

[6] The New Jersey Supreme Court has instructed that "the trial court must make a threshold determination that there is a substantial nexus." *Hitesman*, 218 N.J. at 30, 93 A.3d at 318 (quoting *Dzwonar v. McDevitt*, 177 N.J. 451, 464, 828 A.2d 893, 901 (2003)).

[7] St. Joseph's is a DNV Healthcare accredited institution. The New Jersey Supreme Court has held that "a professional code of ethics governing an employer's activities may constitute authority" for a clear mandate of public policy "in an appropriate setting." *Hitesman*, 218 N.J. at 15, 93 A.3d at 310.

28, 42, 871 A.2d 681, 689 (2005)).  Accordingly, Tinio cannot show a reasonable belief that St. Joseph's acted in a manner incompatible with a clear mandate of public policy.[8]

Therefore, we will affirm the District Court's grant of summary judgment on Tinio's CEPA claim.

## IV.

For the forgoing reasons, we will affirm the District Court's judgment of April 6, 2015.

---

[8] In her Complaint, Tinio asserts a cause of action only under CEPA's "quality of patient care" prong, contained in N.J. Stat. Ann. § 34:19-3(c)(1).  However, the District Court's decision and the parties' briefs are limited to CEPA's cause of action for violations of a "clear mandate of public policy," contained in N.J. Stat. Ann. § 34:19-3(c)(3).  Thus, Tinio has abandoned any claims relating to the quality of patient care.  Even if we were to consider a claim based upon this subsection, our analysis would be substantially similar and we would reach the same result.

11