NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4644-13T2

AMA ARMAH, SHEREE PACE and
SHAWANA BIGGS,

    Plaintiffs-Appellants,

v.

EDUCATION AFFILIATES, INC.,
EFC TRADE III, INC., JANE
CHADWICK and TIMOTHY RODGERS,

    Defendants-Respondents.

_____

Argued April 20, 2015 – Decided  August 26, 2015

Before Judges Lihotz, St. John and Rothstadt.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1126-12.

Julie A. LaVan argued the cause for appellants (LaVan Law, attorneys; Ms. LaVan, of counsel; Alaina A. Gregorio, on the brief).

Scott V. Heck argued the cause for respondents (Gordon & Rees, LLP, attorneys; Elizabeth F. Lorell, of counsel and on the brief; Mr. Heck, on the brief).

PER CURIAM

    Plaintiffs Ama Armah, Sheree Pace, and Shawana Biggs appeal

from the May 9, 2014 summary judgment dismissal of their

complaint alleging violations of the Conscientious Employees

Protection Act, N.J.S.A. 34:19-1 to -8 (CEPA) and constructive discharge by defendants Education Affiliates, Inc. (EA), EFC Trade III, Inc. (EFC), and individual defendants Jane Chadwick and Timothy Rodgers. The motion judge concluded plaintiffs' disclosures did not relate an objectively reasonable "violation of the law or a rule or regulation promulgated pursuant to law." He also rejected plaintiffs' claims for constructive dismissal, repudiating the alleged conduct as "egregious" and finding no nexus existed between alleged whistleblowing activities and plaintiffs' separation from employment.

On appeal, plaintiffs argue the judge erroneously granted summary judgment, distorting the standard for establishing a prima facie CEPA claim, and viewed the evidence in favor of defendants. We disagree and affirm.

I.

We recite the facts as taken from the summary judgment record, viewed in the light most favorable to plaintiffs, the non-moving parties. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014). Although plaintiffs' claims focus on encounters with Rodgers, the specific claims undergirding their causes of action are individual. Therefore, we set forth facts separately alleged by each plaintiff. For the sake of clarity, we first introduce the parties and their relationships, followed

by plaintiffs' asserted actionable conduct, defendants' evidence, and, lastly, recite the motion judge's decision.

Plaintiffs were employed by Fortis Institute, which "is a post-secondary network of colleges and institutes that . . . prepare[s] students for careers in healthcare, nursing, medical, dental, business, information technology, massage, cosmetology and the skilled trades such as welding and HVAC." FORTIS, http://www.fortis.edu/our-difference/our-legacy.aspx (last viewed August 3, 2015). Fortis is owned and operated by EA. EFC assists in the job placement for Fortis graduates.

During plaintiffs' period of employment, Chadwick was the Regional Vice President of Fortis and Rodgers served as Executive Director of the Lawrenceville campus. Chadwick held "operational responsibility for nine [Fortis] campuses located in New Jersey, Pennsylvania, Tennessee, and Virginia" and is Rodgers' direct supervisor. As Executive Director, Rodgers was "responsible for the overall administration of the [Lawrenceville campus], which includes oversight of all departments, admissions, academics, financial aid, career services[,] . . . and . . . the students." Rodgers "worked with and supervised all three [p]laintiffs," who held administrative positions at the Lawrenceville campus.

Armah was the Director of Allied Health Program. She supervised the health department, working with faculty and

students. Biggs began working as a financial aid officer on October 11, 2010 and was responsible for assisting students with the financial aid process. Pace was hired as the Director of Education, a job which included the recruitment, hiring, and supervision of faculty, and, "as the academic leader of the campus," regulation of the policies and procedures governing student education and "faculty development."

## A.

Armah's hostile work environment claims are based on Rodgers' implementation of a perceived illegal and/or unethical class attendance and grade changing policy. The existing policy "published in the student catalog[,] allowed students to miss four days and anything over this meant students had to retake the course without exception." The proposed policy would allow students to attend general make-up hours in the library. Rodgers discussed the make-up class policy with Armah and told her "to introduce it to the students and give them an effective date." However, in subsequent staff and director meetings, when Armah questioned the policy, Rodgers stated he was "delaying" its implementation.

Armah identified two students who she believed had their grades altered under the policy. She maintained the make-up policy was

in direct violation to Fortis' accreditation [requirements] . . . because make-up courses by definition have to be actual classes taught by an instructor as opposed to . . . Rodgers' policy, which gave busy work to be completed in the library without supervision, and simply signed off on by the instructor or director[,] eliminating the responsibility or accountability of the attendance advisor[,] . . . [Kathy] Sinatra.

A related problematic practice altered Fortis' grade change policy. This policy, which was also recorded in the school catalog, "required the student make [a] request to the instructor for the grade(s) in question," and changes were to be approved by the program director. Armah alleged Rodgers, however, used a formula which allowed a student to miss class hours with "the understanding that if they do not satisfy the 'required hours per course[,]' . . . their grade will be affected" and their attendance would be increased "by some unexplained formula." She suggested, "[i]n essence[,] we borrow from the grade (of some[,] not all) and apply it to the attendance[,] then report a false number." Because not all students received the verbal notification of this policy, some were unaware their grades were changed until after the change was actually made. In such cases, the student's grade "did not represent the true academic achievement or true [Grade Point Average] the student earned."

Among Armah's objections to these practices was the policies were introduced orally, making them subject to interpretation and Sinatra was the only person supervising whether students satisfied the hours she reported, even though she could not interpret the attendance reports she generated. When Armah raised these concerns, her access to grade recording software on CampusVue was restricted.[1]

On May 26, 2011, Armah sent a letter to Fortis' human resources department reporting Rodgers treatment of her, and "concerns . . . [she] had with students' attendance, . . . students' grade changing, [and] . . . with the overall [employee] culture." She also related being subjected to unfair and unequal treatment, suggesting Rodgers burdened her with other employees' work.

That same month, Armah suffered an anxiety attack which required hospitalization and a brief leave of absence. When she returned to work, Armah maintained the hostility and harassment continued because she "[spoke] against . . . Rodgers' attendance policy." In October 2011, Armah again left Fortis on sick

---

[1] CampusVue is a web-based platform used by Fortis "as their online gateway to academics, financial aid administration, career placement, office applications, and more." Campus Management, http://www.campusmanagement.com/EN-US/Products/Product%20Sheet/CampusVue_Portal_Product_Sheet.pdf (last viewed August 3, 2015).

leave, citing her health concerns related to anxiety. While on disability, she learned Fortis cancelled her insurance benefits, which she believed was purposeful. The benefits were reinstated with no break in coverage.

Armah provided Fortis with a doctor's letter stating she would be returning to work after the new year. A Fortis human resources officer understood this meant January 3, 2012, and confirmed this understanding in a letter. The correspondence also inquired whether Armah needed an accommodation upon her return. Armah neither responded nor returned to work. She was sent a final notice at the end of January 2012, which itemized the necessary documentation required to continue medical leave and maintain her benefits. The letter concluded with the statement: "If we do not receive the documentation by February 10, 2012, we will consider that you have resigned from your position." Armah did not reply. Fortis considered her as "resigned," effective February 13, 2012.

Armah's response to discovery delineated the following claims of harassment by Rodgers, alleging he: followed her closely in the hallways; locked his office door when meeting with her; listened outside the bathroom while she used the facilities; turned out the bathroom lights while she used the facilities and waited "several minutes, hours, or days before he restored the power"; prevented, interrupted, and ended her lunch

breaks; called her several times on a day off; threatened her while she was at home ill; followed her when she left work during her breaks; delayed or denied provision of resources necessary to perform her duties; delayed approval of her schedule, making her "appear incompetent and ill[-]prepared" to others; caused her discomfort because he stared at her while speaking with co-workers; issued work demands outside her job description; made hostile threats using profane language; and, during one incident, demanded she "stop working, turn around and look him in the eyes," said "nothing more and just stared at [her] for a while[,] then turned around and walked away."

Armah's final claim stated:

> While [she] was out on sick leave, . . . Rodgers changed [her] job description, which now forced [her] to perform more job duties. [Armah]'s signature was placed on the document by someone other than [her], and . . . Rodgers provided [her] with this signed version for her to obtain approval by her doctor to perform these new tasks.

### B.

Biggs alleged she experienced a hostile work environment when she voiced concerns following her review of a federal financial aid application with a student who had not filed tax returns, despite a W-2 reflecting approximately $55,000 in earned income. Biggs alleged Rodgers pulled out federal form 1040 and completed it for the student, who signed it. Rodgers

instructed Biggs to "[k]eep this in the [student's] file" and use it to submit the request for financial aid. As a result, she understood the student received a $9,500 student loan. When asked how the student was able to obtain the loan, Biggs responded "Rodgers worked his magic." Biggs told Rodgers she "was not comfortable with doing [such] things" and "informed him that he needed to sign off on the student's file himself" to approve it because she wanted to avoid "getting in[to] trouble." Biggs recalled one other instance where Rodgers amended a student's tax return and signed off on the file.

Biggs reported these events to Fortis' Regional Director of Financial Aid (RDFA) and mentioned the issue to Pace. The RDFA instructed Rodgers "to stop altering the [Free Application for Federal Student Aid] information." However, in her subsequent conversation with the RDFA and Rodgers, he "engaged in a debate . . . about . . . changing of tax information," and applicable policies." Biggs defended her position that "she did not feel comfortable with changing taxes, and reiterated that she did not wish to be held accountable if anything were to go wrong." The RDFA suggested such conversations should be conducted in "Rodgers' office to 'spare him his dignity.'" Biggs took this as an affront and asserted "time and time again . . . Rodgers trie[d] to make it seem like she doesn't know what she's doing."

Biggs also asserted Rodgers changed students grades "in the system so that students could meet Satisfactory Academic Progress" and "remain eligible to receive financial aid." In her deposition she discussed a failing student whose grades Rodgers apparently changed. It was clear the information was provided to Biggs by Armah. When asked specifics about the grade change, Biggs could not recall, but suggested she believed the change was favorable. She also stated Fortis would benefit because the student would receive financial aid, but again could not remember whether the identified student actually received tuition aid.

Biggs related two additional student grade adjustments. In one instance she identified a disabled financial aid recipient student who "could not pass a class," and whose grade was changed from an "F" to another grade, possibly an incomplete. The second was not identified by name, but Biggs believed the student's grades were adjusted "because she was never in school [so] there's no way she could have gotten a grade other than an I[ncomplete]." Biggs confronted Rodgers about the grade adjustments, which she considered illegal and unethical. Thereafter, Rodgers "proceeded to treat [her] in a hostile manner and give her excessive amounts of work."

In June or early July, 2011, Biggs learned she was pregnant. She informed Fortis "that effective immediately,

[she] was going to resign" and admitted the pregnancy was classified as "high-risk" because of her age. In her complaint, Biggs alleged she "feared if she remained in this extremely stressful and hostile work environment that . . . Rodgers had created . . . she would be at risk of losing her child[,] so she had no option but to resign." Biggs left Fortis on July 17, 2011.

In discovery materials, Biggs identified conduct avowed to support her claims, stating Rodgers: interrupted her lunch by approaching to talk about work matters and assigned "excessive amounts of work"; "st[ood] in the lounge, staring and listening to [her] conversation" with certain coworkers; required her to train a new director he hired; instructed his secretary to sit with her during lunch with certain coworkers recalling Rodgers' secretary stated she "would rather be an informant than to be unemployed"; one time "hid[] in the next cube over listening to [her] conversation" with the new director; constantly follow her around the office; and "would even wait outside the restroom when [she] made use of it, and even entered the men's bathroom and "listened against the wall", noting "[h]e had this terrible cough, uncontrollable cough, so whenever [she] would go into the bathroom[,] it was like clockwork" as she "could hear him coughing."

C.

As Director of Education, Pace objected when she was "not consulted for [the] hiring" of Sinatra as the Director of the Dental Education program and supervisor of the Radiology Department. When Pace asked Rodgers to review Sinatra's credentials, "he refused, became increasingly hostile towards her, and told her not to worry about [Sinatra]'s credentials." Pace maintained Sinatra was "not qualified to teach and supervise the [R]adiology [D]epartment." She also challenged Rodgers' decision to include Sinatra in national conferences, which Pace believed were limited to Deans of Education.

Contemporaneous to these events, Pace objected when Rodgers adopted Sinatra's suggestion to alter the attendance policy, allowing students to make up unexcused absences by attending "make[-]up hours" held in the school library. Pace contended the "attendance issue [wa]s very important," directly affecting the school compliance with requirements set by the Accrediting Bureau of Health Education Schools and national financial aid regulations. Pace did not identify the accreditation standards she believes were impacted by the new policy. When examined during depositions, Pace admitted she never witnessed Rodgers adjusting student attendance, but "heard he may have done [so] after [she] left."

Pace sent emails to various administrators, including Chadwick, describing Rodgers' acts of fraud and harassment.

12                                          A-4644-13T2

Chadwick informed Pace, after an investigation, her claims were determined "unfounded." When Pace suggested she would relate her concerns to EA's Vice President, Rodgers warned her "not to do that, and that if [she] did[,] he'd consider it insubordinate, and he would fire [her]." She recalled Rodgers memorialized these threats in an email, which was not produced in discovery.

We note the record includes emails Pace sent to EA's Vice President, following her leave of absence from employment. Statements made include a characterization of Rodgers' conduct as "fraud"; however, instances corroborating her allegations included only events she learned from others, not those she experienced.

Sometime in January 2011, Pace was hospitalized. She attributed her medical condition to "a lot of stress and anxiety because of how [she] was treated" and "work[ing] long hours." Pace returned to work, but left on medical leave because of "[d]epression and anxiety" on February 15, 2011. Pace was to return to work by March 1, 2011. She did not, citing "the treatment from Fortis . . . and the harassment and nothing being done . . . ."

On May 9, 2011, Pace was notified Fortis' short-term disability insurance carrier had cleared her "to return to work, with no restrictions, effective May 10, 2011." Since Pace had

not communicated with Fortis, she was asked whether she intended to return to work and, if so, what accommodations she required to perform her job responsibilities. Pace was requested to respond "as soon as possible — and in any event no later than this Friday, May 13[, 2011]," otherwise Fortis would "proceed to seek candidates for the job of Director of Education" because it is a "critical position . . . that [the Lawrenceville campus] cannot leave vacant indefinitely."

Pace believed the notice was deliberately sent to her former address. She eventually received the letter and responded, but did not propose a return date, prompting a second notice. The follow-up letter advised Pace "medical documentation no longer support[ed her] leave-of-absence," but Fortis accepted her "word" she had not yet been cleared to return to work by a physician. Reiterating its willingness to provide a reasonable accommodation and the critical need of her response, Fortis requested she provide "an anticipated return-to-work date, so that we may plan accordingly."

Ultimately Pace provided a doctor's note authorizing her to return to work on July 11, 2011, and informed human resources she needed to work less hours and sought "'a written list' of the 'working conditions' that [she] w[ould] be 'subjected to,'" because she did not want to be further harassed by Rodgers. Pace provided no additional medical documentation supporting her

continued leave or describing restrictions necessitating an accommodation.

On July 26, 2011, Fortis officially terminated Pace's employment, citing it held her position open for five months while attempting to work with her to achieve her return; however, Pace refused to cooperate or provide an explanation of how her ability to work was delayed or restricted.

Discovery materials submitted by Pace identified instances of general and specific harassment, as well as retaliatory conduct, by Rodgers as follows: name calling and "expressions of hatred" by Sinatra to students and faculty and Rodgers' refusal to "write her up" or impose discipline; "Rodgers threatened [her] with insubordination" when Pace informed him she would document Sinatra's inappropriate behavior; advised Pace to avoid the "cliques" at lunch time stating "if [she] did not eat lunch with everyone, she could not eat lunch with anyone"; locking his office when speaking to Pace and, when addressing her in her office or the copier room, leaned against the closed door so others could not overhear the conversation; nicknamed her and the registrar "Lucy and Ethel"; required Pace to have two offices, which was "a hassle"; revealed to Sinatra, her "birthdate and age in violation of her right of privacy"; left Sinatra undisciplined when she told others Pace's leave of absence resulted because she was "a psycho"; followed her

15                                           A-4644-13T2

everywhere and watched her on security cameras, controlling whom she could speak with; isolated her, prevented friendships with colleagues, precluded her from taking lunch and other breaks; increased her work hours; and threatened her with insubordination and job loss.

Rodgers' deposition testimony along with defendants' interrogatory answers were attached to the summary judgment motion, filed at the close of discovery. Defendants' denied each of the plaintiff's allegations and submitted identified responses, giving context and content to the facts surrounding these issues. Addressing the attendance policy, defendants maintained "attendance is not a required factor in determining a student's Satisfactory Academic Progress." Fortis' written policy contains no reference to attendance, but discusses minimum requirements based upon credit completion and cumulative GPA.

Rodgers certification, which also accompanied the summary judgment motion, stated "[a]t the time that [p]laintiffs . . . were employed (including while Pace and Armah were on medical leave), there was no attendance requirement set forth by [the

Accrediting Bureau of Health Education Schools]."[2]  He denied suggesting the new make-up policy, noting accrued make-up hours in the library never adjusted a student's actual attendance because "the make-up hours were not classes taught by instructors."

Responding to allegations regarding grade changes for specific students, Rodgers acknowledged he "did change grades" while serving as the Registrar and entered "incompletes." Rodgers described resultant circumstances after he noticed several failing grades issued by an instructor following completion of her first module.  Questioning the new instructor, he learned she issued failing grades because student work was not completed.  Rodgers directed her to Fortis' published policy, which "allow[ed] students who have not completed work to request an incomplete grade, after which they have [fourteen] days to make that up, and, at the end of that [fourteen] days, with . . . that completed work, [Fortis would] assign a new grade or . . . revert [it] back to an 'F.'"  Rodgers also discovered faculty members in the Allied Health Program were not familiar with the policy, despite its publication, and informed them of the policy's provisions.

---

[2]   On November 8, 2011, Fortis implemented a new attendance adjusting policy where "[a]ny student that had attendance below 80% would drop a grade unless there were excused absences to support the absence(s)."

Rodgers also denied "fudging" any financial aid forms, suggesting he merely "reviewed the files to make sure that the information that was necessary was there." Following his exercise of "professional judgment," a policy he stated was sanctioned by the federal Department of Education, "[a] student's financial aid application and information c[ould] be modified based on [a] change in circumstances over what was the base year determination of . . . eligibility." Addressing specific student situations, he explained their changed financial circumstances and his preparation of documents for internal financial aid purposes was designed to record the students' current financial situation. Regarding the student identified by Pace, Rodgers explained he had a college degree and would have been eligible for the $9500 student loan under any circumstance.

In the separate summary judgment motions seeking to dismiss each plaintiff's complaint, defendants argued no plaintiff established a CEPA claim. Importantly, defendants maintained no plaintiff could identify any law or regulation Rodgers violated related to their disclosures. Plaintiffs' opposition asserted the evidence was sufficient to show they reasonably believed Rodgers violated the law and they experienced harassment and retaliation for objecting to and refusing to participate in unlawful practices.

Following oral argument, the Law Division judge granted defendants' motions and dismissed plaintiffs' complaint in its entirety. He agreed with defendants, finding no evidence of an "objective belief" defendants violated the law or a regulation. At best, plaintiffs' challenged compliance with internal policies regarding make-up time, attendance, or changing grades to incompletes, activities which is not covered by CEPA.

Plaintiffs' claims for constructive discharge were also rejected. The judge found Rodgers' alleged behavior towards all three plaintiffs did not rise to the level of egregious conduct "so intolerable that reasonable persons would resign." The judge noted plaintiffs were not terminated or forced to resign for objecting to alleged policy violations. Armah and Pace were discharged for their failure to provide documentation substantiating their extended absences and inform Fortis when they would return to work. As for Biggs, she identified the altered tax returns and grades as the principle basis of her claims. However, no evidence of any altered tax returns or grades "in an unethical or illegal manner" was presented. Rather, the record evinced student financial information and grades were adjusted "in accordance with . . . [Fortis'] grade changing policy and the rules governing financial aid."

Lastly, the judge repudiated plaintiffs' claims of fraud on the federal government because "[t]hat argument ha[d] only been

raised recently in opposition to th[e summary judgment] motion."
An order memorializing the judge's decision was entered on May
9, 2014.

Plaintiffs moved for reconsideration, which was denied.
The judge reemphasized plaintiffs' CEPA claims were legally
untenable because allegations of illegal activity were
"objectively unreasonable." This appeal ensued.

## II.

## A.

Appellate review of a trial court's summary judgment
determination is well-settled.

> In our de novo review of a trial
> court's grant or denial of a request for
> summary judgment, we employ the same
> standards used by the motion judge under
> Rule 4:46-2(c). Brickman Landscaping, supra,
> [219] N.J. [at 406]. First, we determine
> whether the moving party has demonstrated
> there were no genuine disputes as to
> material facts, and then we decide whether
> the motion judge's application of the law
> was correct. Atl. Mut. Ins. Co. v. Hillside
> Bottling Co., 387 N.J. Super. 224, 230-31
> (App. Div.), certif. denied, 189 N.J. 104
> (2006). In so doing, we view the evidence
> in the light most favorable to the non-
> moving party. Brill v. Guardian Life Ins.
> Co. of Am., 142 N.J. 520, 523 (1995).
> Factual disputes that are merely
> "'immaterial or of an insubstantial nature'"
> do not preclude the entry of summary
> judgment. Ibid. (quoting Judson v. Peoples
> Bank & Trust Co., 17 N.J. 67, 75 (1954)).
> Also, we accord no deference to the motion
> judge's conclusions on issues of law. Estate

> of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83 (2010).

> [Manhattan Trailer Park Homeowners Ass'n v. Manhattan Trailer Court & Trailer Sales, Inc., 438 N.J. Super. 185, 193 (App. Div. 2014).]

"The very object of the summary judgment procedure . . . is to separate real issues from issues about which there is no serious dispute." Shelcusky v. Garjulio, 172 N.J. 185, 200-01 (2002). A motion for summary judgment will not be precluded by bare conclusions lacking factual support, Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011), self-serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 413-14 (App. Div. 2013), or disputed facts "of an insubstantial nature." Pressler & Verniero, Current N.J. Court Rules, comment 2.1 on R. 4:46-2 (2015). "[W]hen the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Brill, supra, 142 N.J. at 540 (citation and internal quotation marks omitted).

### B.

CEPA was "enacted . . . to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (citation and internal quotation marks omitted).

The statute provides, in pertinent part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or
>
>> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

22

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

To establish a prima facie case under CEPA, a plaintiff must show:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against

him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Dzwonar, supra, 177 N.J. at 462.]

This standard does not require a plaintiff to "show that his or her employer or another employee actually violated the law or a clear mandate of public policy." Id. at 462, 464. Rather, "a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred." Id. at 464.

> In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

> [Ibid.]

See Klein v. UMDNJ, 377 N.J. Super. 28, 40 (App. Div.) ("CEPA requires judicial resolution of threshold legal issues respecting existence of a statutory, regulatory or other clear mandate of public policy before the trier of fact determines whether an employee has been retaliated against for acting upon an objectively reasonable belief of the existence of such clear mandate by objecting to or refusing to perform acts in violation

24                                                          A-4644-13T2

of the mandate." (citation and internal quotation marks omitted)), certif. denied, 185 N.J. 39 (2005).

Once a plaintiff establishes these elements, the burden shifts to the defendant to "advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee." Id. at 38. "If such reasons are proffered, [the] plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39.

### III.

On appeal, plaintiffs argue the judge erroneously imposed a "heightened standard of reasonableness" and improperly weighed the facts contrary to accepted principles governing summary judgment, which directs evidence be viewed favorably to the non-moving party. Plaintiffs maintain the judge simply concluded "[d]efendants' version of the facts were correct and [p]laintiffs' version of the facts were incorrect." We disagree.

In their argument, plaintiffs suggest summary judgment is vaulted merely because they objected to Rodgers' conduct, which they reasonably believed was unlawful or violated public policy. Essentially, they maintain the judge must accept their individual assertions of "a reasonable belief" regarding the nature of the conduct. The flaw in plaintiffs' suggestions, however, is a law, regulation, or policy must exist at the time

25                                                          A-4644-13T2

of the objection and "the objecting employee must have an objectively reasonable belief . . . that such activity is either illegal, fraudulent," or contrary to a recognized public policy." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193 (1998).

Contrary to plaintiffs' assertions, it is not sufficient to label conduct "unlawful," as the notion something "is illegal" will not satisfy this element. See Dzwonar, supra, 177 N.J. at 464 (discussing objective reasonable belief element). The objectively reasonable belief of illegal conduct must be grounded upon a law, regulation, or policy. A plaintiff does not ultimately need to be correct to prove the conduct was illegal, only show his or her belief was reasonably based upon an existing law or regulation.

As noted by the motion judge, the record does not identify any law, regulation or guideline purportedly breached or violated. Plaintiffs maintained Rodgers violated financial aid and accreditation regulations, but never identified which regulations they believed governed his conduct. We conclude the judge's rejection of the overarching contention suggesting Rodgers' conduct was illegal fully comports with the required standards. See Heyert, supra, 431 N.J. Super. at 414 ("[S]elf-serving statement[s], standing alone, [are] insufficient to create a genuine issue of material fact . . . .").

Plaintiffs' supposition the trial judge improperly applied the standard of review for summary judgment is equally unavailing. The implication of the judge's statement that no proof existed, "other than the plaintiffs' words," is directed to the contentions of illegal conduct challenged by plaintiffs in their disclosures as violating regulations governing Fortis' accreditation or federal financial aid law. The motion judge did not assess credibility or weigh the evidence offered. In fact, his analysis properly sifted through the factual record, from which he concluded facts advanced by plaintiffs, at best, reflected challenges to Fortis' internal practices and policies. Other than their general assertions accreditation and financial aid requirements were violated, plaintiffs offered no evidence to suggest Rodgers engaged in illegal or unethical conduct.

Moreover, plaintiffs' statements Rodgers ignored school protocol by delineating guidelines for adjusting attendance and adjusting grades, were belied by Fortis' written policies showing attendance was not linked to grades and use of an incomplete grade was permitted under specific circumstances. Importantly, the four students identified to experience positive grade changes, so as to affect accreditation or financial aid, were shown by defendants to actually have been assigned lower grades.

27 A-4644-13T2

As for Biggs' assertions of fraudulent financial aid documentation, those statements were directly contradicted by federal statutes and case law supporting school discretion in modifying student financial aid information. See 20 U.S.C. § 1087tt; U.S. v. Brown Univ., 5 F.3d 658, 662 (3d Cir. 1993) ("[S]chools may increase or decrease the family contribution determination using their professional judgment. Professional judgment may be used only on a case-by-case basis when special circumstances exist. Through the exercise of professional judgment, schools may have differing family contribution determinations for the same applicant." (citations omitted)). Rodgers' factual assertions applying the governing regulations were unrefuted.

Finally, no documentary or testimonial evidence shows or tends to show application of the new objectionable policies described by plaintiffs. Affected students complaints were not produced and plaintiffs could not recall incidents with specificity.

The disagreement with internal corporate or business policies or their application, which do not otherwise violate the law, are not whistleblower activities.[3]    Klein, supra, 377

---

[3]    We do not view Pace's complaint about Sinatra's competence as the type of CEPA-covered compliance activity by a watchdog employee discussed in Lippman v. Ethicon, Inc., __ N.J. __
(continued)

N.J. Super. at 44 (rejecting a claimant's disagreement with his employer over "internal procedures . . . , potentially tied to some extent to funding issues" as "an objectively reasonable belief that public [policy] mandates [were] being violated").

> In _Maw v. Advanced Clinical Comm[unications]_, Inc., 179 N.J. 439, 444 (2004), the [Supreme] Court explained that a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3) conveys[:]
>
>> a legislative preference for a readily discernable course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, rule or regulation promulgated pursuant to law such that . . . under [N.J.S.A.] 3(c)(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct.
>
> [_Massarano v. N.J. Transit_, 400 N.J. Super. 474, 489 (App. Div. 2008).]

---

(continued)
(2015). In that matter, the "[p]laintiff's normal job duties included providing his medical opinion about the safety of defendant pharmaceutical company's products." _Id._ at 10-11. His CEPA action claimed his employer retaliated against him for objecting to corporate practices. _Id._ at 11. The trial court granted the defendants' motion for summary judgment on the ground that plaintiff's performance of his regular job duties could not constitute CEPA-protected conduct. _Ibid._ The Supreme Court rejected this view, holding "CEPA's protections extend to the performance of regular job duties by watchdog employees." _Id._ at 12, 45.

Lastly, the judge discussed the supporting documentation surrounding each plaintiff's termination or resignation as unrelated to the claimed harassing or retaliatory conduct.[4] Armah did not provide documentation to support continued medical leave and did not return to work; Biggs left work to safeguard her baby when told hers was classified as a high-risk pregnancy; and Pace's conduct was considered as a resignation when she did not return to work despite being cleared to do so following her medical leave.

Following our review, we reject plaintiffs' suggestion the judge imposed an incorrect, heightened standard of review. The record amply supports his findings of no identifiable whistleblower activity and no nexus between disclosures and each plaintiff's separation from employment. The newly advanced claims of psychological injury, unsupported by expert evidence,

---

[4]    We further note, the record references Equal Employment Opportunity Commission (EEOC) complaints filed by Armah and Biggs asserting each was subject to harassment and a hostile work environment. "Congress created the EEOC and established an administrative procedure under Title VII . . . to provide the EEOC with an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit." Rodriguez v. Raymours Furniture Co., 436 N.J. Super. 305, 325 (App. Div.) (second alteration in original) (citation and internal quotation marks omitted), certif. granted, ___ N.J. __ (2014).  The EEOC determined the claims were unsubstantiated and informed plaintiffs of their right to sue.  Although not determinative of plaintiffs' CEPA claims, these facts lend support to the conclusion Rodgers' conduct was not harassing.

is also rejected.  See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (holding "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for . . . presentation [wa]s available unless the questions . . . go to the jurisdiction of the trial court or concern matters of great public interest." (citation and internal quotation marks omitted)).

Given our opinion, we reject plaintiffs' attack on the denial of their motion for reconsideration.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION