**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3085-19

LAWANDA KITCHEN and
JONATHAN RUFFIN,

     Plaintiffs-Appellants,

v.

SPRINGPOINT SENIOR
LIVING, IRENE D'OVIDIO,
SANDI KO, KEATING
ROBINSON, and PEGGY
McMAHON,

     Defendants-Respondents,

and

LIANA CUBAN,

     Defendant.

_____

     Argued September 1, 2021 – Decided September 28, 2021

     Before Judges Geiger and Mitterhoff.

     On appeal from the Superior Court of New Jersey, Law
     Division, Middlesex County, Docket No. L-5826-17.

Barbara K. Lewinson argued the cause for appellants (Barbara K. Lewinson, LLC, attorneys; Barbara K. Lewinson, of counsel; Jeffrey Zajac, on the brief).

Denise M. Dadika argued the cause for respondents (Epstein Becker & Green, PC, attorneys; Denise M. Dadika, of counsel and on the brief; Jiri Janko, on the brief).

PER CURIAM

Plaintiffs Lawanda Kitchen and Jonathan Ruffin appeal from a February 20, 2020 Law Division order granting summary judgment to defendants Springpoint Senior Living (Springpoint), Irene D'Ovidio, Sandi Ko, Keating Robinson, and Peggy McMahon dismissing the complaint. We affirm.

We derive the following facts from the motion record, viewed in the light most favorable to the non-moving plaintiffs. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Springpoint is a continuing care retirement community. Kitchen is a Licensed Practical Nurse (LPN) who was employed by Springpoint from October 29, 2006 to May 30, 2017, when she was terminated. Kitchen is African American.

Kitchen worked in a two-story Springpoint facility that contained a Skilled Nursing Unit, an Assisted Living Unit, and Taylor Commons. She was initially assigned to the Skilled Nursing Unit but over the course of her

employment worked in all three units.  Taylor Commons housed ten to twelve residents.  The Assisted Living Unit could accommodate up to forty residents.

During 2015, Kitchen's schedule changed from working five nights per week to three nights per week.  The new schedule required her to work sixteen-hour shifts.  Kitchen claimed that the new schedule resulted in short staffing that prevented her from taking work breaks.  Kitchen admits she does not know the staffing levels required by State regulations.  She further admits that no resident health issues occurred because of staffing levels in 2015 or 2016.

Kitchen claims that her "employment record and environment were good to excellent until the Fall of 2015 when she began to encounter problems with [her] supervisor, Irene D'Ovidio, the newly assigned Unit Manager for the Skilled Nursing Unit."

Kitchen testified that between 2012 and April 2015, D'Ovidio gave African American nurses who worked the night shift a "hard time" by questioning their complaints that patients were not safe, displaying "an attitude" toward them, and making false complaints against them.  In addition, prior to May 2015, Kitchen was informed by Marcia White, an African American co-worker, that D'Ovidio stated she was going to "fix all us black bitches" who worked the night shift in the Skilled Nursing Unit.

3

Thereafter, D'Ovidio was promoted to Director of Nursing, replacing defendant Liana Cuban. On October 5, 2015, Kitchen received a disciplinary warning for failing to prepare a monthly summary for a patient. Kitchen claims she was on vacation and believed that another employee should have prepared the summary.

Kitchen alleged that African American nurses worked short-handed while the shifts worked by Caucasian nurses were always fully staffed. Beginning in 2015, Kitchen alleged that she complained to Ko, Linda Rose, Judith Marte, and Mary Cannon regarding perceived inadequacies, irregularities, and violations of workplace requirements. This included repeated complaints about short-staffing the 3:00 p.m. to 11:00 p.m. shift in the Skilled Nursing Unit.

Defendants deny Kitchen made such complaints. They rely on recorded conversations between Kitchen and Ko, Rose, Marte, and Cannon that contain no such complaints. In addition, during a recording that Kitchen made of her post-termination conversation with Sue Thomson, Kitchen admitted she had not told anyone about the lack of breaks on the overnight shift.

While company policy required two nurses and four aides, plaintiff asserted that the overnight shift was frequently staffed by only one nurse and two aides. Plaintiff alleged this "made work difficult" because there were forty

A-3085-19

residents in the Skilled Nursing Unit, preventing her and the employees she supervised from taking meal and work breaks; since company policy required that at least two employees always remain in the unit. On April 17, 2016, Kitchen was disciplined for leaving the unit with just one aide remaining.

Plaintiff further complained to management and corporate compliance about several instances of misconduct in December 2015 and January 2016 including: (1) failure to properly enter medication orders into electronic health records; (2) medication dispensing errors; (3) lost medication; and (4) failure to properly sign for narcotics.

In August 2016, Kitchen complained that D'Ovidio failed to properly destroy medications. D'Ovidio was asked by management to resign but was told they would attempt to place her in a nursing position at a different Springpoint facility. Ultimately, D'Ovidio was given an ultimatum to resign or face termination. She resigned effective August 26, 2016.

Kitchen received disciplinary warnings on February 15, 2016, for removing a Fentanyl patch without two licensed nurses present, and on April 17, 2016, for leaving Taylor Commons during an overnight shift. Kitchen contested the warnings, and both were subsequently rescinded. Kitchen contends both warnings were retaliatory.

A-3085-19

Kitchen alleges the following additional retaliation. In the Spring of 2016, Kitchen was transferred from the Skilled Nursing Unit to the Assisted Living Unit and Taylor Commons. On January 9, 2017, Kitchen was cited for speaking to a security guard in an improper manner and for her presence in the Skilled Nursing Unit.

On January 28, 2017, Kitchen received a "desk reference" warning for failing to write an incident report about a dementia patient who had fallen and the failure to send the injured patient for evaluation of the resulting head injury. Kitchen claimed, however, that the fall occurred before her shift began.

On December 1, 2016, Cannon was hired as Springpoint's Administrator and Assistant Executive Director. On March 3, 2017, Marte was hired as the new Assisted Living Coordinator. Marte reported to Cannon. Notably, both were hired more than one and one-half years after D'Ovidio made racist comment to White and months after D'Ovidio resigned.

In relevant part, Springpoint's Employee Manual provides:

SLEEPING DURING WORK HOURS

> You are expected to be alert at all times while on duty. It is particularly important that employees on the night shift be alert for any emergency that might arise. Employees found sleeping on duty or on Springpoint property will be subject to disciplinary action up to and including termination of employment.

6

A-3085-19

The manual entitles employees to two fifteen-minute breaks and an unpaid thirty-minute meal break when they work five or more hours in a day. The breaks must be scheduled in accordance with the needs of the department.

On May 22, 2017, Marte arrived at work early and found Certified Nursing Assistant (CNA) Susan Conteh asleep in an armchair in the living room area of the Assisted Living Unit. Security camera footage confirmed that Conteh had been sleeping most of her shift. The footage also revealed that another CNA, Rakiatu Alghali, had slept in an armchair right next to Conteh for more than three hours that morning. On May 31, 2017, Springpoint terminated both Conteh and Alghali for violating its no sleeping policy. Kitchen was aware they were terminated for sleeping during the overnight shift.

The incident that precipitated Kitchen's termination occurred on June 4, 2017. At around 2:00 a.m., Marte and Cannon observed Kitchen sitting at a computer desk with her eyes closed and her hand on her computer mouse. When she did not wake up during the two-minute period they observed her, Marte took a photograph of Kitchen with her cell phone. The photograph depicts Kitchen sitting at the computer with her eyes closed. Kitchen admitted that she did not hear Marte or Cannon enter or see them observing or photographing her.

A-3085-19

That same night, Marte and Cannon spoke to another employee, Sara Glybo, who admitted she had slept during her shift. Unlike Glybo, Kitchen denied she was sleeping at her computer desk and claimed she was watching training videos. When Marte and Cannon challenged Kitchen's explanation, Kitchen admitted she did not know which door they used to enter the unit, even though she would have heard the door close if she were awake. Marte and Cannon decided to suspend Kitchen pending investigation. Kitchen was terminated two days later. The decision to terminate Kitchen was made collectively by Marte, Cannon, Human Resources Director Thompson, and Executive Director Jean Brophy, and was reviewed and approved by corporate Human Resources.

Corporate Compliance Director Ko subsequently interviewed a security employee who stated she had previously observed Kitchen and CNAs regularly sleeping while on duty.

Kitchen maintains that a security video camera should have captured her behavior, but it was not provided in discovery. She worked a double shift that night. Kitchen contends that a Caucasian nurse was also found sleeping on the job but received no discipline.

8

On October 3, 2017, plaintiffs filed a six-count complaint naming Springpoint, D'Ovidio, Ko, Robinson, and Liana Cuban as defendants. The complaint asserted claims for violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14 (count one); violation of the New Jersey Law against Discrimination (LAD), N.J.S.A. 10:5-1 to -42 (count two); interference with economic advantage (count three); intentional infliction of emotional distress (count four); per quod damages for "loss of society and consortium" and "personal emotional anxiety" (count five)[1]; and aiding and abetting (count six). Kitchen alleged that she was terminated because she was African American and in retaliation for whistleblowing.

On December 15, 2017, plaintiffs filed a first amended complaint that named Peggy McMahon as an additional defendant and corrected the name of Kitchen's husband to Jonathan Ruffin.

Following the close of discovery, defendants moved for summary judgment. Springpoint contended that Kitchen was terminated because she was sleeping while on duty in violation of its no sleeping during work hours policy.

---

[1] Ruffin's per quod claim is derivative of Kitchen's claims.

A-3085-19

Plaintiffs opposed the motion.[2] In their initial opposing papers, plaintiffs did not oppose dismissal of the LAD claim (count two). In their sur-reply brief, they opposed dismissal of count two.

The judge issued a February 20, 2020 order and written opinion granting summary judgment to defendants. He explained that CEPA cases have a one-year statute of limitations which begins to run when the cause of action accrues. Each discrete discriminatory act starts a new clock as to that act. Considering the October 3, 2017 filing date, the judge determined that plaintiff was permitted to litigate discrete retaliatory acts occurring after October 3, 2016. Plaintiff's transfer to a different department, the loss of her supervisory role, and multiple write ups were deemed time-barred by N.J.S.A. 34:19-5.

Plaintiff's claim for retaliatory discharge was not time-barred and the judge addressed the claim on the merits by applying the 4-part test derived from N.J.S.A. 34:19-3(c), focusing on the fourth prong which requires plaintiff to "establish a causal connection between the protected activity and the alleged retaliation by the employer." Plaintiff alleged she was terminated based on her

---

[2] Plaintiffs filed two briefs and two Statements of Material Facts in opposition to the motion. They also filed a sur-reply brief. These additional submissions are not permitted without leave of the court. See R. 1:6-5; R. 4:46-1, -2(b).

complaints of short staffing during night shifts and her inability to take breaks.

The judge found plaintiff could not sustain a claim under CEPA because:

> [p]laintiff has not set forth sufficient proofs that there exists a causal connection between the protected action and her termination, which is the alleged subsequent adverse employment action for these two whistleblowing complaints . . . . Plaintiff was terminated for legitimate, non-retaliatory reasons. Plaintiff was observed sleeping on the job by two of [p]laintiff's supervisors. Plaintiff's sleeping was recorded by a picture which conclusively demonstrated that she was sleeping in every practical sense.

Next, the judge considered the four instances in which plaintiff alleged racial discrimination and found that plaintiff established a prima facie LAD case as it related to those four instances. The judge explained that after a successful demonstration of discrimination by plaintiff, the burden shifts to defendants to demonstrate there was a legitimate business decision to terminate plaintiff. The judge found defendants met their burden by observing Kitchen for minutes with her eyes closed and photographing her sleeping. Despite plaintiff's contention she was not sleeping, the judge was

> convinced that [d]efendant need not conclusively show that [p]laintiff had achieved actual sleep by definition in order to be in violation of the "no sleep" policy. Plaintiff was in effect sleeping and not being attentive or productive. This [c]ourt concludes that [d]efendant has demonstrated a nondiscriminatory reason for

11

termination such that the burden . . . shifts back to [p]laintiff.

Following the second burden shift, the judge found plaintiff did not meet her burden overcoming defendant's legitimate business reason for discharge because "termination of a CNA on the same shift for the same reason as [p]laintiff only reinforces that [d]efendants acted on a legitimate business reason."

The judge addressed the hostile work environment claims cumulatively and did not find enough evidence for a jury to find defendants acted with "race motivated animus." The judge found that reduced staffing on night shifts, the lack of similar complaints or negative write-ups from other African American employees, and D'Ovidio's statement toward black employees did not rise to the level of a hostile work environment.

This appeal followed. Plaintiffs raise the following points for our consideration.

POINT I

BECAUSE THE PLAINTIFF MADE OUT A PRIMA FACIE CASE FOR A HOSTILE WORK ENVIRONMENT CLAIM UNDER CEPA, THE LAW DIVISION ERRED BY GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

A. The Plaintiff Presented a Prima Facie Case of a Hostile Work Environment under CEPA.

12

B. The Plaintiff's Hostile Work Environment Claim Is Not Barred by the CEPA Statute of Limitations Period.

C. The Law Division's Decision Represents Reversible Error.

POINT II

BECAUSE THE PLAINTIFF MADE OUT A PRIMA FACIE CASE FOR RETALIATORY DISCHARGE UNDER CEPA, THE LAW DIVISION ERRED BY GRANTING SUMMARY JUDGMENT.

A. The Plaintiff Was Under a Reasonable Belief that Employees of the Defendant Were Engaged in Conduct that Violated Both the Laws of New Jersey and Clear Mandates of Public Policy.

B. The Plaintiff Performed a Whistleblowing Activity When She Reported the Activities of Springpoint's Employees.

C. Plaintiff Was Subjected to an Adverse Employment Action as a Result of Her Protected Whistleblowing Activities.

D. A Causal Connection Exists Between Plaintiff's Whistleblowing Activities and the Adverse Employment Action Taken by Defendants.

E. The Law Division's Decision Represents Reversible Error.

## POINT III

### THE LAW DIVISION ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING THE PLAINTIFF'S CLAIM UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citation omitted). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting R. 4:46-2(c)). We consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). "If there is no genuine issue of material fact, we must 'decide whether the trial court correctly interpreted the law." DepoLink Ct. Rep. & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)).

14

Motions for summary judgment require trial and appellate courts to review the motion record against "the elements of the cause of action, [and] the evidential standard governing that cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). To that end, we turn our discussion to the governing principles in CEPA and LAD actions, including the applicable statutes of limitations.

CEPA's Purpose and Hostile Work Environment Test

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). As a remedial statute, CEPA "promotes a strong public policy of the State" and "should be construed liberally to effectuate its important social goal." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431).

To support a claim of hostile work environment based upon race, plaintiff must present prima facie evidence that the conduct complained of (1) would not have occurred but for the employee's protected status, it was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment are altered, and the working environment is hostile or abusive.

Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603–04 (1993); see also Taylor v. Metzger, 152 N.J. 490, 498 (1998) (applying the Lehmann test to hostile work environment claim based upon race).

"'Retaliation,' as defined by CEPA, need not be a single discrete action." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003). "Indeed, 'adverse employment action taken against an employee' . . . can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Ibid. (quoting N.J.S.A. 34:19-2(e)).

Although a single incident of harassment can create a hostile work environment, "'it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable [person situated as the claimant], make the working environment hostile.'" Taylor, 152 N.J. at 500 (quoting Lehmann, 132 N.J. at 606–07); accord Rios, 247 N.J. at 11. The test's second, third, and fourth prongs "are interdependent." Rios, 247 N.J. at 10-11 (quoting Lehmann, 132 N.J. at 606–07).

> One cannot inquire whether the alleged conduct was 'severe or pervasive' without knowing how severe or pervasive it must be. The answer to that question lies in the other prongs: the conduct must be severe or pervasive enough to make a reasonable woman believe

that the conditions of employment are altered and her working environment is hostile.

[Ibid. (emphasis in original).]

We apply "an objective standard to evaluate a hostile work environment claim." Id. at 12 (citations omitted). "The standard focuses on the harassing conduct itself and 'not on its effect on the plaintiff or on the work environment.'" Ibid. (quoting Lehmann, 132 N.J. at 606). "[N]either 'a plaintiff's subjective response' to the harassment, nor a defendant's subjective intent when perpetuating the harassment is controlling of whether an actionable hostile environment claim exits.'" Ibid. (citations omitted) (quoting Cutler v. Dorn, 196 N.J. 419, 431 (2008)).

Taylor presented a rare and extreme case which informs our opinion. The plaintiff, a sheriff's officer, alleged that the defendant Sheriff of Burlington County stated, "[t]here's the jungle bunny" to her in the presence of another supervisor, the undersheriff. Taylor, 152 N.J. at 495. The Court found "[t]he term defendant used, 'jungle bunny,' is patently a racist slur, and is ugly, stark and raw in its opprobrious connotation" and "had an unambiguously demeaning racial message . . . ." Id. at 502-03. The court also noted, "the severity of the remark . . . was exacerbated by the fact that it was uttered by a supervisor or superior officer. Defendant was not an ordinary co-worker of plaintiff; he was

the Sheriff . . . . That fact greatly magnifies the gravity of the comment." Id. at 503. "Because the sheriff was both plaintiff's superior and her offender, plaintiff could not seek the redress that would otherwise be available to a victim of invidious workplace harassment, namely, resort to her own supervisor." Id. at 505. The Court concluded that a factfinder could reasonably determine the racial insult was sufficiently severe under the circumstances to create a hostile work environment. Id. at 506-07.

The Lehmann standard applies to hostile work environment claims, including claims based on racial comments. Taylor, 152 N.J. at 498-500. Any such claims must be evaluated considering "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Rios, 247 N.J. at 10-11 (quoting Jersey City Bd. of Educ., 177 N.J. at 447).

Ordinarily, a plaintiff has one year from the occurrence of the retaliation to file an action under CEPA. N.J.S.A. 34:19-5. Retaliatory actions can be a single discrete action, like the failure to promote, or a hostile work environment, which consists of "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that

combine to make up a pattern of retaliatory conduct." Jersey City Bd. of Educ., 177 N.J. at 448. Under the continuing violation doctrine, which applies to CEPA claims, id. at 446-49, "a plaintiff may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 6-7 (2002) (citing West v. Phila. Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).

In Shepherd, the Court highlighted the difference between a hostile work environment claim that falls within the continuing violation doctrine and a claim based on a discrete act that does not. 174 N.J. at 19-20.

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative [e]ffect of individual acts.
>
> . . . .
>
> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing

to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

[Ibid. (alterations in original) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-17 (2002) (citations and footnotes omitted)).]

The court adopted the following two-prong test:

First, have plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants? If yes, then their cause of action would have accrued on the day on which those individual acts occurred. Second, have plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment? If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding "that some of the component acts of the hostile work environment [have fallen] outside the statutory time period."

[Id. at 21 (alteration in original) (quoting Morgan, 536 U.S. at 117).]

Here, plaintiff received the following disciplinary warnings and citations: warned for removing a Fentanyl patch without two nurses present (February 15, 2016); warned after leaving Taylor Commons during an overnight shift (April 17, 2016); demoted from the Skilled Nursing Unit (April or May 2016); cited for improperly speaking to a security guard and for her presence in the Skilled Nursing ward (January 9, 2017); and cited for failure to write a report for a patient (January 28, 2017). Plaintiff testified that between 2012 and April 2015, D'Ovidio "[gave African American nurses] an attitude" or made false complaints about them. Plaintiff was informed from a secondhand source that D'Ovidio made a statement that she was going to "fix all us black bitches" referring to the African American nurses on the night shift of the Skilled Nursing ward. Plaintiff does not, however, identify any one incident as so severe that it created a hostile work environment. Therefore, we examine the conduct complained of over the course of her time at Springpoint to determine whether the cumulative effect of the alleged discriminatory conduct was so pervasive as to alter the conditions of her employment.

We do not take plaintiff's allegations that she was subjected to racial bias in the workplace lightly. However, we note that her complaints are distinguishable from those in Taylor. The nature and frequency of the alleged

21

discriminatory acts over the course of four years at Springpoint do not depict a work environment in which the terms of employment have been altered by acts of racial discrimination.

Viewed cumulatively, we do not find the circumstances to suggest hostility under the Morgan factors outlined above. The frequency of the discriminatory conduct—five minor warnings in two years—is not pervasive. Several disciplinary actions were rescinded. The warnings and citations did not result in punitive actions beyond one reassignment to another area of the facility with no loss in pay or benefits. Plaintiff did not allege that the warnings were either physically threatening or humiliating, or that they unreasonably interfered with her work performance.

Hostile work environment claims are different from discrete acts because they involve repeated conduct, and plaintiff has not offered any evidence of repeated conduct that was hostile or abusive. Instead, plaintiff relies upon a few rescinded minor disciplinary actions.

Although the trial court considered Springpoint's actions to be discrete acts, we agree that even when considered as a pattern of conduct, plaintiff has failed to show that a hostile work environment existed. Springpoint acted within its power to discipline plaintiff for forbidden conduct. Based on the facts

alleged, none of the warnings or citations, individually as discrete acts, or taken cumulatively as a pattern, would suggest to a reasonable African American woman in the same situation that the environment was hostile or abusive when considered in the same light as the facts in Taylor or Rios.

CEPA Retaliatory Discharge

To establish a prima facie case under CEPA, a plaintiff must prove:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

"The evidentiary burden at the prima facie stage is 'rather modest . . . .'" Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). Moreover, "[t]hese requirements must be liberally construed to effectuate CEPA's important social goals."

Maimone v. City of Atl. City, 188 N.J. 221, 230 (2006). CEPA prohibits employers from retaliating against an employee who:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .; or
> >
> > (2) is fraudulent or criminal . . . ;
>
> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer . . .; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;
> >
> > (2) is fraudulent or criminal . . .; or
> >
> > (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3.]

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

A-3085-19

Once a plaintiff establishes the four elements outlined in Dzwonar, the burden shifts to the defendant to "advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee." Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005). "If such reasons are proffered, plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39.

Employees attempting to establish a violation of CEPA must demonstrate a causal connection between their protected activity and the retaliation. Maimone, 188 N.J. at 237. Causation "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive," and the evidence of pretext may serve that function. Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550-52 (App. Div. 1995). The temporal proximity of protected activity followed by an adverse employment action is usually insufficient by itself to establish the causal connection. Young v. Hobart W. Grp., 385 N.J. Super. 448, 466-67 (App. Div. 2005). New Jersey applies the burden-shifting approach developed under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which applies to CEPA retaliation claims. Massarano v. N.J. Transit, 400 N.J. Super. 474, 492 (App. Div. 2008).

The approach requires a plaintiff to establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Once a prima facie case is established, the second prong of the McDonnell Douglas test requires the employer "to articulate some legitimate, nondiscriminatory reason for" its action. Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). That is not a burden of persuasion, which "remains at all times with the plaintiff." Id. at 253. The employer only needs to "articulate" a nondiscriminatory reason for its action "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 253-256.

Indeed, the employer never has the burden of proving that its proffered reason was the actual reason for its action, "because the burden of proving the actual discrimination lies at all times with the plaintiff." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). The employer's articulation must be "taken as true," and the court's evaluation of it during this second part of the McDonnell Douglas test "can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

If the employer articulates a nondiscriminatory reason, the plaintiff loses the benefit of the presumption established by the prima facie case. Burdine, 450 U.S. at 255-56. To survive the employer's motion for summary judgment, the

plaintiff must present "evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of" the action in question. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

The plaintiff's evidence of pretext may be indirect, Burdine, 450 U.S. at 256, or circumstantial, Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 75 (App. Div. 2004). It may even be simply the incredibility of the employer's proffered reason, which, in conjunction with the prima facie case, may be legally sufficient to support the inference that the alleged discriminatory reason was an actual one. St. Mary's, 509 U.S. at 511.

The plaintiff does not have to show that the prohibited reason was the employer's sole reason, but rather just that it may have been one of the employer's "but[-]for" reasons. Fuentes, 32 F.3d at 764. However, while employers may not act for a prohibited purpose, they are free, when unlawful discrimination is not a factor, to make personnel decisions objectively or subjectively, and in a manner that is unpopular with the employees. Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 345-46 (App. Div. 1997).

27

Kitchen filed her complaint on October 3, 2017. Thus, any retaliatory action must have taken place less than one year earlier to state a viable CEPA claim, unless the continuing violation doctrine applies. The judge found plaintiff's claims based on CEPA for retaliatory discharge were not time-barred. The judge agreed with plaintiff's contention that she: (a) reasonably believed her employer's conduct was illegal; (b) performed a "whistle-blowing" activity; and (c) an adverse employment action occurred. The problem is satisfying the fourth prong, which requires a causal connection between the whistle-blowing activity and the adverse action.

Plaintiff was terminated in June 2017, after she was observed and photographed sleeping on duty by Marte and Cannon. Notably, Marte and Cannon, who were not named as defendants, were hired after D'Ovidio was terminated. Plaintiff has presented no evidence that her termination was causally connected to her December 2015 to January 2016 whistleblowing activities which included registering complaints to management regarding missing narcotics, medication errors, and a cover-up by supervisors. When there is little temporal proximity, the employee "must set forth other evidence to establish the causal link." Hobart West Group, 385 N.J. Super. at 467.

Kitchen claims that the judge did not properly consider the evidence. On appeal, she argues that the judge did not apply the correct complaints to the retaliatory discharge analysis. In his opinion, the judge stated, "[p]laintiff alleges that she was terminated because she complained of the night crew being short-staffed, and that she was unable to take breaks because of being short-staffed." In her brief, plaintiff argues the record was distorted by the judge's statement and instead asserts she was terminated for her whistleblowing activity. We are unpersuaded.

Following plaintiff's whistle-blowing activity in January 2016, Springpoint cited plaintiff for five infractions in the following year until plaintiff was ultimately terminated eighteen months after the whistle-blowing activities took place. This lack of temporal proximity militates strongly against inferring retaliatory action. In sum, Kitchen has not satisfied the fourth prong of the prima facie case for retaliation under CEPA.

In the alternative, if a tenuous causal connection were found, plaintiff is unable to demonstrate pretext based on Springpoint's legitimate, non-discriminatory reason for her termination. Importantly, Springpoint is not required to prove that Kitchen was actually sleeping at her desk or that it was the actual reason for her termination. The burden of proving discrimination

29

always lies with the plaintiff. Kitchen cannot satisfy that burden. Kitchen was observed motionless with her eyes closed for over two minutes by two supervisors. The photograph corroborates their observations. Two CNAs found sleeping were terminated shortly before plaintiff. Plaintiff has not shown that the reason expressed by Springpoint for her termination was pretextual.

To defeat a summary judgment motion, Kitchen was obligated to present evidence that casts sufficient doubt on the expressed reason for termination, so that a reasonable fact finder could find it was a fabrication or infer that discrimination was more likely than not a motivating factor for the action. She failed to do so. Defendants presented corroborated evidence that Kitchen was sleeping while on duty, a violation of company policy allowing termination. Springpoint houses residents who are elderly. Some suffer from dementia. A nurse sleeping on duty is unaware of their surroundings and the conduct of the residents, who may attempt to elope from the facility, placing them at risk.

Moreover, D'Ovidio resigned before Marte or Cannon were hired. There is no evidence that they knew of D'Ovidio's racist remark when they suspended Kitchen. The decision to terminate Kitchen was made collectively by Marte, Cannon, Thompson, and Brophy. Aside from her termination, Kitchen does not allege any other acts of antagonism, retaliation, or racial animus by any of them.

A-3085-19

<u>Law Against Discrimination Claim</u>

Plaintiff brought separate legal claims against defendants under CEPA arising out of the same allegations of reprisal. Her LAD claims are foreclosed by CEPA's election-of-remedies provision, N.J.S.A. 34:19-8, which plainly states that "the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and remedies available under any other . . . State law." <u>See also</u> <u>Young v. Schering Corp.,</u> 275 N.J. Super. 221, 238 (App. Div. 1994) (applying N.J.S.A. 34:19-8). Therefore, plaintiff's LAD claim was properly dismissed.

Plaintiffs' argument that they may proceed under the LAD for alleged discrimination occurring beyond CEPA's one-year statute of limitation lacks sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3085-19